CHIEF JUSTICE LINDSAY
delivered the opinion of the court.
Smith N. Hawes stood indicted in the Kenton Criminal Court for uttering forged paper, for embezzlement, and also upon four separate and distinct charges of forgery. He was found to be a resident of the town of London, in the dominion of Canada, and in February, 1877, was demanded by the President of the United States, and surrendered by the Canadian authorities, to answer three of said charges of forgery. As to the fourth charge, the evidence of his criminality was not deemed sufficient, and that alleged offense was omitted from the warrant of extradition. The demand and surrender were made in virtue of and pursuant to the 10th article of the treaty concluded August 9, 1842, between the kingdom of Great Britain and the United States of America.
The attorney for the Commonwealth caused two of the indictments for forgery to be dismissed. Hawes was regularly tried under each of the remaining two, and in each case a judgment of acquittal was rendered in his favor upon verdicts of not guilty.
After all this, however, the officers of Kenton County continued to hold him in custody; and finally, on motion of the attorney- for the Commonwealth, one of the indictments for embezzlement was set down to be tried on the 6th day of July, 1877. Further action was postponed from time to time *701 until the 21st of August, 1877, when Hawes presented his .affidavit, setting,out all the facts attending his surrender, and the purposes for which it was made, and moved the court to continue all the indictments then pending against him, and to surrender him to the authorities of the United States, to he by them returned, or permitted to return, to his domicil and asylum in the dominion of Canada. This motion was subsequently modified to the extent that the court was asked to set aside the returns of the sheriff on the various bench-warrants under which he had been arrested, and to release him from custody. The court, in effect, sustained this modified motion, and ordered “That the cases of the Commonwealth of Kentucky v. Smith N. Hawes, for embezzlement and for uttering forged instruments with intent, etc,., be continued, and be not again placed on the docket for trial, and that said Hawes be not held in custody until the further order of this court.”
From said order the Commonwealth has prosecuted this appeal. It is not final in its nature, but under the provisions of sections 335 and 337 of the Criminal Code of Practice it may, nevertheless, be reviewed by this court.
It was the opinion of the learned judge (Jackson) who presided in the court below, that the 10th article of the treaty of 1842 impliedly prohibited the government of the United States and the Commonwealth of Kentucky from proceeding to try Hawes for any other offense than one of those for which he had been extradited, without first affording him an opportunity to return to Canada; and that he could not be lawfully held in custody to answer a charge for which he could not be put upon trial.
The correctness of this opinion depends on the true construction of the 10th article of the treaty, and also on the solution of the question as to how far the judicial tribunals of the federal and state governments are required to take cogni *702 zance of, and in proper cases to give effect to treaty stipulations between our own and foreign governmeqts.
Section 2, article 6 of the federal constitution declares, that “This constitution, and the laws of the United States made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land, and the judges of every state shall be bound thereby, any thing in the constitution and laws of any state to the contrary notwithstanding.” It will thus be seen that with us a public treaty is not merely a compact or bargain to be carried out by the executive and legislative departments of the general government, but a living law, operating upon and binding the judicial tribunals, state and federal, and these tribunals are under the same obligations to notice and give it effect as they are to notice and enforce the constitution and the laws of congress made in pursuance thereof.
“A treaty is, in its nature, a compact between two nations, not a legislative act. It does not generally effect of itself the object to be accomplished, especially so far as its object is infra-territorial, but is carried into execution by the sovereign powers of the respective parties to the instrument. In the United States a different principle is established. Our constitution declares a treaty to be the law of the land. It is consequently to be regarded in the courts of justice as equivalent to an act of the legislature whenever it operates of itself, without the aid of any legislative provision.” (Foster v. Neilson, 2 Peters, 253, per Chief Justice Marshall.)
When it is provided by treaty that certain' acts shall not be done, or that certain limitations or restrictions shall not be disregarded or exceeded by the contracting parties, the compact does not need to be supplemented by legislative or executive action, to authorize the courts of justice to decline to override those limitations or to exceed the prescribed restrictions, for the palpable and all-sufficient reason, that to do so would be *703 not only to violate the public faith, but to transgress the “ supreme law of the land.”
A different rule seems to have been intimated in the case of Caldwell (8 Blatchford C. C. Reports, 131); but the real decision rendered in that, as in the subsequent case of Lawrence (13 Blatchford C. C. Reports, 295), decided by the same judge, was, that extradition proceedings had pursuant to the treaty under consideration do not, by their nature, secure to the person surrendered immunity from prosecution for an offense other than the one upon which the surrender is made; and the intimation in Caldwell’s case that the judiciary may leave it to the executive department to interfere to preserve and protect the good faith of the government in a case like this, is at the most but a dictum.
The 10th article of the treaty of 1842 is as follows: “It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them or their ministers, officers, or authorities, respectively made, deliver up to justice all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found within the territories of the other; provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the crime or offense had there been committed; and the respective judges and other magistrates of the two governments shall have power, jurisdiction, and authority, upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, *704 the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive.”
It will be seen that the trial and punishment of the surrendered fugitive for crimes other than those mentioned in the treaty is not prohibited in terms, and that fact is regarded as of controlling importance by those who hold to the view that Hawes was not entitled to the immunity awarded him by the court below. But if the prohibition can be fairly implied from the language and general scope of the treaty, considered in connection with the purposes the contracting parties had in view, and the nature of the subject about which they were treating, it is entitled to like respect, and will be as sacredly observed as though it was expressed in clear and unambiguous terms.
Public treaties are to be fairly interpreted, and the intention of the contracting parties to be ascertained by the application of the same rules of construction and the same course of reasoning which we apply to the interpretation of private contracts.
By the enumeration of seven well defined crimes for which extradition may be had, the parties plainly excluded the idea that demand might be made as matter of right for the surrender of a fugitive charged with an offense not named in the enumeration, no matter how revolting or wicked it may be.
By providing the terms and conditions upon which a warrant for the arrest of the alleged fugitive may be issued, and confining the duty of making the surrender, to cases in which the evidence of criminality is sufficient, according to the laws of the place where such fugitive is found, to justify his commitment for trial, the right of the demanding government to decide finally as to the propriety of the demand and as to the evidences of guilt, is as plainly excluded as if that right had been denied by express language.
*705 It -would scarcely be regarded an abuse of the rules of construction, from these manifest i'estrictions, unaided by extraneous considerations, to-deduce the conclusion that it was not contemplated by the contracting parties that an extradited prisoner should under any circumstances be compelled to defend himself against a charge other than one upon which he is surrendered, much less against one for which his extradition could not be demanded. The consequences to which the opposite view may lead, though by no means conclusive against it, are nevertheless to receive due and proper weight.
It would present a remarkable state of case to have one government saying, in substance, to the other: “You can not demand the surrender of a person charged with embezzlement; my judges or other magistrates have no right or authority upon such a demand, either to apprehend the person so accused orto inquire into the evidences of his criminality,.and if thcv should assume to do so, and should find the evidence sufficient to sustain the charge, the proper executive authority could not lawfully issue the warrant for his surrender. But you may obviate this defect in the treaty by resting your demand upon the charge of forgery, and if you can make out a prima-facie case against the fugitive, you may take him into custody, and then without a breach of faith, and without violating either the letter or spirit of our treaty, compel him to go to trial upon the indictment for the non-extraditable offense of embezzlement.”
And if this indirect mode of securing the surrender of persons guilty of other than extraditable offenses may be resorted to, or if the demand, when made in the utmost good faith to secure the custody of a criminal within the provisions of the treaty, can be made available to bring him to justice for an offense for which he would not have been surrendered, then we do not very well see, how either government could complain if a lawfully extradited fugitive should *be tried and. *706 convicted of a political offense. Prosecutions- for the crime of treason are no more provided against by the treaty than prosecutions for the crime of embezzlement, or the offense of bribing a public officer.
Mr. Fish, in his letter of May 22, 1876, to Mr. Hoffman, in reference to the extradition of Winslow, attempts to meet this difficulty by saying, that “Neither the extradition clause in the treaty of 1794, nor in that of 1842 contains any reference to immunity for political offenses, or to the protection of asylum for religious refugees. The public sentiment of both countries made it unnecessary. Between the United States and Great Britain it was not supposed on either side that guaranties were required of each other against a thing inherently impossible, any more than by the laws of Solon was a punishment deemed necessary against the crime of parricide, which was beyond the possibility of contemplation.” ’
But President Tyler under whose administration the treaty of 1842 was concluded, evidently thought the guaranties of immunity to political refugees 'were to be implied from the treaty itself] and not left to rest alone on the public sentiment of the two countries. In communicating a draft of the treaty to the .senate for its ratification, speaking of the subject of extradition he said: *“ The article on the subject in the proposed treaty is carefully confined to such offenses as all mankind agree to regard as heinous and destructive of the security of life and property. In this careful and specific enumeration of crimes, the object has been to exclude all political offenses, or criminal charges arising from wars or intestine commotions— treason, misprision of treason, libels, desertion from military service, and other offenses of similar character are excluded.” This interpretation was cotemporaneous with the treaty itself, and deserves the higher consideration, from the -fact that it was contained in a paper prepped by the then secretary of state, Mr. Webster, who represented the government *707 of the United States in the negotiations from which it resulted.
It seems also that the treaty was understood in the same way by the British Parliament in 1843. The act of parliament of that year passed for the purpose of carrying it into effect directed that such persons as should thereafter be extradited to the United States should be delivered “to such person or persons as shall be authorized in the name of the United States to receive the person so committed, and to convey him to the United States, to be tried for the crime of which such person shall be accused.” The precise purpose for which the fugitive is to be surrendered is set out in exact and apt language, and the act negatives by necessary implication the right here claimed, that the person' surrendered may be tried for an offense different from that for which he was extradited, and one for which his surrender could not have been demanded.
The American’ executive in 1842, and the British Parliament in 1843, seem to have been impressed with the conviction that the treaty secured to persons, surrendered under its provisions, an immunity from trial, for political offenses, far more stable and effectual than the public sentiment of the two countries. Experience had taught them that, in times of intestine strife and civil commotions, the most enlightened public sentiment may become warped and perverted, just as it has taught mankind that man is sometimes capable of com-*mitting the unnatural crime of parricide, although such a crime seemed impossible to the great Athenian lawgiver. And this view was adhered to by congress in 1848, when the general law providing for the surrender of persons charged with crime, to the various governments with which we had treaty stipulations on that subject, was passed. After setting out the necessary preliminary steps, it was provided by the 3d section of that act, that “ It shall be lawful for the secretary of state, under *708 bis hand and seal of office, to order the person so committed to be delivered to such person or persons as shall be authorized, in the name and on behalf of such foreign government, to be tried for the crime of which such person shall be accused.”
This, like the act of parliament declares the purpose of the surrender to be, that the alleged offender may “ be tried for the crime of which such person shall be accused.”
The maxim expressio unius est exclusio alterius may with propriety be applied to each of these acts; and read in the light of that maxim they are persuasive, at least, of the construction which, up to 1848, the two contracting parties had placed on the 10th article of the treaty.
The act of congress is, in one view, more important than the British act of 1843. It does not rest alone on the proper interpretation of a particular treaty, and may be regarded as a legislative declaration of the American idea of the fundamental or underlying principles of the international practice of extradition.
The ancient doctrine that a sovereign state is bound by the laws of nations to deliver up persons charged with or convicted of crimes committed in another country, upon the demand of the state whose laws they have violated, never did permanently obtain in the United States. It was supported by jurists of distinction, like Kent and Story, but the doctrine has long prevailed with us that a foreign government has no right to demand the surrender of a violator of its laws, unless we are under obligations to make the surrender in obedience to the stipulations of an existing treaty. (Lawrence’s Wheaton on International Law, 233, and authorities cited.) As said by Mr. Cushing, in the matter of Hamilton, a fugitive from justice of the state of Indiana, “It is the established rule of the United States neither to grant nor to ask for extradition of criminals as between us and any foreign government, unless *709 in cases for which stipulation is made by express convention.” (Opinions of Attorney-generals, vol. 6, 431.)
From the treatise of Mr. Clarke on the subject of extradition, we feel authorized to infer that this is the English theory; but whether it is or not, that government certainly would not, in the absence of treaty stipulations, surrender fugitives to a government which, like ours, will refuse to reciprocate its acts of comity in this respect.
The right of one.government to demand and receive from another the custody of an offender who has sought asylum upon its soil, depends upon the existence of treaty stipulations between them, and in all cases is derived from and is measured and restricted by the provisions, express and implied, of the treaty. The fugitive Hawes, by becoming an inhabitant of the dominion of .Canada, secured the protection of British laws, and we could only demand his surrender in virtue of our treaty with that government, and we held him in custody for the purposes contemplated by that treaty,, and for none other. He was surrendered to the authorities of Kentucky to be tried upon three several indictments for forgery. The Canadian authorities were of opinion that the evidences of his criminality were sufficient to justify his commitment for trial on said charges. One of them the Commonwealth voluntarily abandoned. He was tried upon the remaining two, and found not guilty in each case by the jury, and he now stands acquitted of the crimes for which he was extradited. It is true he was in court and in the actual custody of the officers of the law when it was demanded that he should be compelled to plead to the indictment for embezzlement. But the specific purposes for.which the protection of the British laws had been withdrawn from him, had been fully accomplished, and he claimed that in view of that fact, the period of his extradition had been determined; that his further detention was not only unauthorized, but in violation of the stipulations of the treaty *710 under which he was surrendered, and that the Commonwealth could not take advantage of the custody in which he was then wrongfully held, to try and punish him for a non-extraditable offense.
To all this it was answered, that “ an offender against the justice of his country can acquire no rights by defrauding that justice;” that “between him and the justice he has offended, no rights accrue to the offender by flight. He remains at all times, and every where liable to be called to answer to the law for his violations thereof, provided he comes within the reach of its arm.” Such is the doctrine of the cases of Caldwell and Lawrence (8 and 13 Blatchford’s Reports) and of the ease of Lagrave (59 New York). And if the cases of Caldwell and Lawrence could be freed from the complications arising out of the residence of the prisoners within the territorial limits of the British crown, and the fact that we received them from the authorities of the British government in virtue of and pursuant to treaty stipulations, it would be sound doctrine and indisputable law.
But did Caldwell or Lawrence come within the reach of the arms of our laws? They were surrendered to us by a foreign sovereign to be tried for specified crimes, and were forcibly brought, for the purposes of those trials, within the jurisdiction of our courts. And the point in issue was not whether the prisoners had secured immunity by flight, but whether the court could proceed to try them without disregarding the good faith of the government, and violating the “supreme law.”
The legal right of a judicial tribunal to exercise jurisdiction in a given case must, from the nature of things, be open to question at some stage of the proceeding, and we find it difficult to conceive of a person charged with crime being so situated as not to be permitted to challenge the power of the court assuming the right to try and punish him.
*711 The doctrine of the cases of Caldwell and Lawrence has been sanctioned by several prominent British officials and lawyers, and has seemingly been acted upon by some of the Canadian courts, and in one instance (that of Herlbrown) by an English court. We say seemingly, for the reason that in Great Britain, treaties are regarded as international compacts, with which in general the courts have no concern. They are to be carried into effect by the executive, and the courts are subject to executive control to the extent necessary to enable it to prevent the breach of treaty stipulations in cases of this kind. Hence, when a party charged with crime claims immunity from trial, on account of the provisions of the treaty under which he has been extradited, he must apply to the executive to interfere through the law officers of the crown to stay the action of the court, otherwise it will not at his instance stop to inquire as to the form of his arrest, or as to the means by which he was taken into custody.
But a different rule prevails with us, because our government is differently organized. Neither the federal nor state executive could interfere to prevent or suspend the trial of Hawes. Neither the Commonwealth’s attorney nor the court was to any extent whatever subject to the direction or control either of the President or the Governor of the Commonwealth. But the treaty under which the alleged immunity was asserted being part of the supreme law, the court had the power, and it was its duty if the claim was well founded, to secure to him its full benefit. The question we have under consideration has not been passed on by the Supreme Court of the United States, and it therefore so far remains an open one, that we feel free to decide it in accordance with the result of our own investigations and reflections.
Mr. William Beach Lawrence, in the 14th vol., p. 96, Albany Law Journal, on the authority of numerous European writers, said, “ All the right which a power asking an extra *712 dition can possibly derive from the surrender must be what is expressed in the treaty, and all rules of interpretation require the treaty to be strictly construed; and consequently, when the treaty prescribes the offenses for which extradition can be made and the peculiar testimony to be required, the sufficiency of which must be certified to the executive authority of the extraditing country, the state receiving the fugitive has no jurisdiction whatever over him except for the specified crime to which the testimony applies.”
This is the philosophy of the rule prevailing in France. The French Minister of Justice in his circular of April 15, 1841, said, “The extradition declares the offense which leads to it, and this offense alone ought to be inquired into.”
The rule as stated by the German author Heffter, is, that “The individual whose extradition has been granted can not be prosecuted nor tried for any crime except that for which the extradition has been obtained. To act in any other- way, and to cause him to be tried for other crimes or misdemeanors, would be to violate the mutual principle of asylum and the silent clause contained by implication in every extradition.”
And when President Tyler expressed the opinion that the treaty of 1842 could not be used to secure the trial and punishment of persons charged with treason, libels, desertion from military service, and other like offenses, and when the British Parliament and the American Congress assumed to provide that the persons extradited by their respective governments should be surrendered “to be tried for the crime of which such person shall be so accused,” this dominant principle of modern extradition was both recognized and acted upon.
This construction of the 10th article of the treaty is consistent with its language and provisions, and is not only in harmony with the opinions and .modern practice of the most enlightened nations of Europe, and just and proper in its application, but essential to render it absolutely certain that *713 the treaty can not be converted into an instrument by which to obtain the custody and secure the punishment of political offenders.
Hawes placed himself under the guardianship of the British laws by becoming an inhabitant of Canada. We took him from the protection of those- laws under a special agreement, and for certain named and designated purposes. To continue him in custody after the accomplishment of those purposes, and with the object of extending the criminal jurisdiction of our courts beyond the terms of the special agreement, would be a plain violation of the faith of the transaction, and a manifest disregard of the conditions of the extradition. He is not entitled to personal immunity in consequence of his flight. We may yet try him under each and all of the indictments for embezzlement and for uttering forged paper, if he comes voluntarily within the jurisdiction of our laws, or if we can reach him through the extradition clause of the federal constitution, or through the comity of a foreign government. But we could not add to or enlarge the conditions and lawful consequences of his extradition, nor extend our special and limited right to hold him in custody to answer to the three charges of forgery, for the purpose of trying him for offenses other than those for which he was extradited.
We conclude that the court below correctly refused to try Hawes for any of the offenses for which he stood indicted, except the-three charges of forgery mentioned in the warrant of extradition, and that it properly discharged him from custody.
The order appealed from is approved and affirmed.