## Case No. 15,487.

### UNITED STATES v. JOHNSON.

[1 N. J. Law J. 162.]

District Court, D. New Jersey.　May 14, 1878.

FUGITIVES FROM JUSTICE—INTERSTATE RENDITION —HABEAS CORPUS—JURISDICTION OF FEDERAL COURTS.

[The federal courts cannot, by habeas corpus, release a person held for trial in a state court, either on the ground that he was seized in another state in an illegal manner, and without compliance with the act regulating interstate rendition, or on the ground that he is held to answer for a different crime than that for which he was extradited.]

The prosecutor, in custody in the Essex county jail, sued out a writ of habeas corpus in the United States district court. He had been arrested in the District of Columbia, and brought under a requisition from the governor of New Jersey to this state. It was claimed the arrest was irregular, etc. The opinion sets forth the main facts.

A. Q. Keasbey and George M. Robeson, for prosecutor.

G. N. Abeel and Jacob Vanatta, for defendant.

NIXON, District Judge. I am quite clear that the facts presented by the return and the testimony in this case preclude the court from discharging the prisoner on these proceedings, whatever may be the opinion of the court in regard to the methods adopted by the agents of the state to obtain the possession of the body of the petitioner; and I should be sorry to say or do anything which might be construed into an approval of such methods and proceedings. It nevertheless appears affirmatively that the prisoner is detained by the legal authority of the state, to answer certain alleged violations of the criminal laws of New Jersey. The case falls within the provisions of section 753 of the Revised Statutes of the United States, which restricts the writ of habeas corpus to a case, where the prisoner in jail is in custody under or by color of the authority of the United States, or is committed for trial before some court thereof; or is in custody for an act done or omitted in pursuance of a law of the United States, or an order, process or decree of a court or judge thereof; or is in custody in violation of the constitution, or of a law or treaty of the United States; or unless when it is necessary to bring the prisoner into court to testify.

It appears by the petition, return and evidence that the prisoner was brought into the state of New Jersey from the District of Columbia by persons claiming to act under the constitution and laws of the United States, in regard to the extradition of fugitives from justice. The second section of article 4 of the constitution provides that a person charged in any state with treason, felony or other crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state whence he fled, be delivered up to be removed to the state having jurisdiction of the crime. The act of congress of February 12, 1793 (section 5278, Rev. St. [1 Stat. 302]), was passed to provide the machinery to carry into effect this provision, and it is therein made the duty of the executive of the state or territory to which a person charged with the crimes generally designated in the constitution has fled, upon lawful demand, to cause the fugitive to be arrested and surrendered up. The alleged fugitive in the present case being in the District of Columbia, the demand was made upon the chief justice of the supreme court, under section 843 of the Revised Statutes, relating to the District of Columbia, wherein that officer is directed to deliver up fugitives from justice in the same manner and under the same regulations as the executive authorities of the several states are required to do under the extradition act (Rev. St. §§ 5278, 5279). The demand of Gov. Clellan upon Chief Justice Carter was dated March 11, 1878, and was based upon the allegations that the prisoner stood charged with the crime of perjury, committed in the county of Essex, state of New Jersey; that he had fled from the justice of said state, and had taken refuge within the District of Columbia. It requested that the petitioner be delivered up to Robert Lang and Andrew J. McManus, who were authorized to receive and convey him to the state of New Jersey, there to be dealt with according to law.

The grounds alleged in the petition for the discharge of the prisoner were, that he was a citizen of Connecticut, residing at New Haven, in said state; that in the latter part of February last he left his home for the purpose of attending to certain business in the city of Washington in relation to legislation then pending before the congress of the United States under consideration by a committee of the senate; that he passed openly, in the daytime, through the state of New Jersey, and took rooms at the hotel in the city of Washington, where he remained from day to day in the open and public pursuit of the business objects for which his presence was required at the capital, and attended from time to time before the senate committee, and held conferences with different members of congress, concerning the business which he had in hand; that he was thus engaged on the 11th of March last, and in the evening of that day had retired to his bed as usual, when, at about midnight, he was awakened and disturbed by the entrance of three men into his room, who informed him that they had authority to arrest him, and

intended to take him to the state of New Jersey; that he demanded their authority, which they refused to produce, insisting that he should go with them to the police station; that he requested that they would permit him to send for his counsel, which they also refused; and that, finally, upon their threats to use force, and in order to avoid disturbance in the hotel in the middle of the night, he allowed them to take him without actual resistance to the police station, upon the express condition and promise that they would send for his counsel early in the morning; that they placed him in close confinement, and did not allow him to see or communicate with any person, but kept him confined until about one o'clock p. m. on the 12th of March, when they placed him in the train, and brought him to Newark, New Jersey, and lodged him in the Essex county jail, where he has since remained; that during all this time they exhibited no warrant or paper of any kind, although he repeatedly insisted that they should do so, and he could obtain no information as to the grounds or authority for arrest except vague verbal statements of the officers, one of whom, during the morning, in reply to reproaches of the petitioner for their failure to notify his counsel, said that he would frankly let him understand that he was not to be allowed to see counsel or any person until he got to New Jersey; that he has since ascertained that Robert Lang, as the agent of the state of New Jersey, arrived in Washington on the evening of the 11th of March, with a requisition from the governor of the state of New Jersey; that before presenting the same to the proper authorities in the District of Columbia, in order to ascertain whether a warrant would be issued thereon, and without any judicial proceedings or warrant whatever, the said agent, with the assistance of the police officers, invaded the sleeping room of the petitioner, and hurried him to the police station, as before stated, and kept him there until, at the opening of the court in the next morning, they went before Chief Justice Carter, and presented the requisition, and obtained a warrant for the arrest of the petitioner "if he should be at large," and for his delivery to said agent for removal to New Jersey; that the said requisition and the warrant were founded upon an indictment against the petitioner found in April, 1877, in the Essex oyer and terminer, for perjury, alleged to have been committed by him in an examination under oath before a police justice, upon a complaint against him for an alleged conspiracy; that the petitioner is advised that such indictment was void on its face, for the reason that no person charged with crime can lawfully be put under oath on a preliminary examination, and that perjury cannot be assigned thereon, and for other causes apparent upon said indictment; that if the petitioner had had opportunity to consult counsel or defend himself against said arrest,

no warrant could properly have been issued on said requisition, and, if issued, it would have been vacated upon proper legal proceedings; that upon a writ of habeas corpus, issued on his application, and allowed by one of the justices of the supreme court of New Jersey for the purpose of being admitted to bail, the warden returned that he held him in custody only by virtue of the said requisition and the proceedings thereon; that such proceedings were instituted in pursuance of a law of the United States, providing for the surrender of fugitives from justice fleeing from one state to another; that the petitioner was not in fact a fugitive from justice, and had committed no crime in New Jersey or elsewhere; that the indictment which formed the basis of such extradition proceedings did not charge any crime under any statute or at common law, and that, therefore, the arrest in the manner aforesaid was illegal, and a gross violation of the rights of the petitioner as a citizen of the United States.

If the same return had been made to the writ of habeas corpus in this case, that the warden annexed to the writ issued for the prisoner on his application to the supreme court of the state to be admitted to bail, to wit, that he was held in custody only by virtue of the commitment issued by the governor to the keeper of the jail of the county of Essex, the sole question presented would be, whether it were competent for this court to inquire into the sufficiency of the evidence upon which the governor of New Jersey and the chief justice of the District of Columbia acted in making the requisition by the one and the order for rendition by the other. But the return as amended sets forth the existence of new facts which had arisen since the writ was allowed. It not only awarded that the prisoner had been delivered into his custody by virtue of the writ of commitment issued by Governor McClellan of New Jersey, but also that he was held (1) by virtue of writs of capias from the court of oyer and terminer in and for the county of Essex, for the term of April, 1877, and the term of April, 1878; and (2) by virtue of orders of said court remanding him to his custody for trial upon the indictments to which he had hitherto pleaded, the terms of which were annexed, and which were the cause of his detention. The writ of habeas corpus was tested and allowed April 16, 1878. It appears by the copies of the papers annexed to the return, that on the 19th of April the court of oyer and terminer of Essex county caused the prisoner to be placed at its bar to be charged in the indictment for perjury, upon which the requisition had been made, and, on his plea of not guilty, the court had remanded him to the custody of the warden of the jail for trial, upon the 8th of May, upon the indictments to which he had before pleaded; that upon the 26th of April he was again brought to the bar of the court to be charged upon another indictment

for conspiracy, and upon his plea of not guilty the court had again remanded him to the same custody and control to be held for trial. The traverse to the return substantially admits the truth of these allegations, but seeks to break their force by charging that if the arrest of the petitioner, by means of which he was brought within the jurisdiction of this state, was unlawful, he was entitled to his discharge from custody and return to his home, notwithstanding he has been charged with other indictments, and has been ordered to be held for trial since the service of the writ of habeas corpus.

We are thus brought to the consideration of the naked questions (1) whether a fugitive from justice extradited from one state of the Union to another, on the charge of a commission of a specific crime, can be held by the courts of the state to which he is sent for trial for another and different crime; and (2) whether such person may be detained by the authorities of the state, for the prosecution, notwithstanding it may appear that his arrest under the rendition proceedings was without legal authority. If these inquiries are answered in the affirmative, if the state courts, without regard to the lawfulness or unlawfulness of the methods adopted to obtain the custody of the body of the prisoner, may now detain him for trial upon the same or other indictments, charging him with offences against the criminal laws of the state, he has no claim upon this court for a discharge on the grounds that his rights as a citizen were violated by the parties who secured his person in a foreign jurisdiction, other than by a due process of law.

Questions were discussed on the arguments which may properly arise between governments, as to the construction of extradition treaties, or between individuals as to responsibility for the invasion of personal rights, but which, in my judgment, are not involved in the present inquiry. It may be true, that when a treaty exists between two independent nations in regard to the surrender of fugitives, and a criminal is given up on the allegation that he has committed a specified crime, good faith between the governments requires that he should not be tried for other offences. It may be true, that when a citizen has been placed under restraint without lawful cause, he can hold every one who caused or contributed to his imprisonment to a strict responsibility in a civil action. In the one case the right of asylum is sacred, except so far as it has been yielded by the terms of the international compact, and any abuse or perversion by one government of the privileges of arrest granted by the treaty is a just cause of complaint on the part of the other. In the other case, so zealous is the law in regard to any invasion of the individual liberty of the citizen, that all unauthorized restraint of his person is followed by damages against the offend-ing party. But here a court of competent jurisdiction has the custody of a person who is charged with the commission of certain offences against the laws of the state. The answer to the charge is, that some other party has done a wrong to the prisoner, by violating the laws of another state in arresting him without proper authority. In a criminal case, this can hardly be reckoned a pertinent response. A person arraigned for the commission of a felony cannot plead in bar, that he ought to be excused from answering the charge, because other parties have trespassed upon his personal rights. It is a confounding of matters which are essentially separate and distinct. It is a claim on the part of the accused that his criminal violation of the laws is to be condoned by his personal injuries. It is asking a court to suspend the exercise of its most responsible duties, to wit, the trial of alleged offenders against the penal code of the state, while the persons charged with the crime are instituting preliminary investigations into the method adopted to bring them within its jurisdiction. Such a course, for obvious reasons, is allowable in a civil suit between private litigants, but, for like obvious reasons, cannot be, and never has been, allowed in criminal proceedings, where the object of the prosecution is to punish an offence against the public. On a claim of this sort, the court says to the prisoner: "You are going too fast; we will consider one thing at a time, and every thing in its regular order. The precise matter which now concerns you and the court is whether you are guilty of the crime charged against you. As you happen to be found within our jurisdiction, we will first settle that question, and afterwards, if need be, will inquire into the circumstances attending your rendition for trial, or will leave the respective governments to discuss them, or will remit you to the recovery of such damages as you may be able to obtain in the civil courts for the violation of your rights of person."

All the authorities in Great Britain and the United States, when carefully distinguished and interpreted by the circumstances, support this view of the law. The earliest cases in England to which the attention of the court has been called are Rex v. Marks, 3 East, 157, before the king's bench in 1802, and Ex parte Krans, 1 Barn. & C. 258, in the same court in 1823, in both of which it was held, that when a party was liable to be detained on a criminal charge, the court would not inquire on a habeas corpus into the manner in which the capture had been effected.

The Case of Scott, 9 Barn. & C. 446, before the king's bench in 1829, was this: A rule nisi had been obtained for a habeas corpus to bring up the body of the prisoner in the custody of the marshal, in order that she might be discharged, on the ground that she had been improperly apprehended in a foreign country. It appeared in the return that

an indictment for perjury had been found against her in London; that a warrant for her arrest to appear and plead had been granted; that the police officer, having the warrant, went beyond the jurisdiction, and followed her to Brussels, and then arrested her, conveyed her to Ostend against her will; thence back to England. Chief justice, on discharging the rule, said: "The question is this: Whether if a person charged with a crime is found in this country, it is the duty of the court to take care that such party shall be amenable to justice, or whether we are to consider the circumstances under which she was brought here. I thought, and still continue to think, that we cannot inquire into them." The courts of South Carolina in the same year were considering the same question as appears by the case of State v. Smith, 1 Bailey, 283. Smith had been convicted in 1821, under the laws of South Carolina, of stealing a slave, and had received sentence of death, but was pardoned by the governor, on condition that he would remain in close confinement until January 1, 1823, and then, within fifteen days, leave the state, and never return to it. The pardon was accepted by the defendant, who remained in confinement the time specified, and, within fifteen days after being liberated, removed to North Carolina, where he resided until 1827. He then returned to South Carolina, and remained there until July, 1829. On the 6th of that month, the governor issued his proclamation stating that the defendant was then at large in South Carolina, in open violation of the condition of his pardon, and offering a reward for his apprehension. On the 17th of the same month, the defendant again went into North Carolina, and was shortly afterwards forcibly seized by certain citizens of South Carolina, without any warrant or authority from any officer or tribunal of either state, except the proclamation of the governor, and was brought into South Carolina, and lodged in jail. The prisoner was brought before Chancellor Harper, by writ of habeas corpus, and a motion made for his discharge, on the ground that, his arrest being illegal, his detention was equally so. The chancellor, in refusing the discharge, said: "The ground principally relied on is the irregularity in the manner of his arrest. He was arrested by means of a violation of the laws and jurisdiction of the state of North Carolina. * * * But, when an individual charged with a criminal offence is before a magistrate, the sole inquiry is, does there appear sufficient cause for his commitment, or binding him to his answer? No matter what irregularities have occurred in his arrest, or whether he has ever been arrested or no; if it appear that the laws have been criminally violated, it is the duty of the officer to take measures for vindicating them by a prosecution." An application was afterwards made for his discharge before the court of appeals, on account of his

illegal arrest, and the court sustained the views of the chancellor; holding that it was no ground for the discharge or exemption from punishment of a person who had been guilty, within the limits of South Carolina, of an offence against the laws, that he was subsequently arrested with lawless violence in the territory of another state, and brought within South Carolina, in violation of the jurisdiction of the state in which he was arrested; and that, in whatever manner he was brought within the jurisdiction of South Carolina, he must answer for the previous violation of her laws.

In the case of State v. Brewster, 7 Vt. 118, before the supreme court of Vermont, in 1835, an attempt had been made in the court below to have the proceedings in an indictment against the defendant dismissed, on the ground that he was forcibly, and against and without the assent of the authorities of Canada, brought from the province, the place of his residence, by citizens of Vermont, for the purpose of being prosecuted for the offence charged. The court held that the matter set up could not avail the prisoner. "In this case" it said, "the offence, if committed at all, was committed within our jurisdiction, and it is punishable by our laws. The defendant, although a foreigner is, if guilty, equally subject to our jurisdiction with our own citizens. His escape into Canada did not purge the offence nor oust our jurisdiction; being retaken and brought in fact within our jurisdiction, it is not for us to inquire by what means or in what precise manner he may have been brought within the reach of justice; it becomes then immaterial whether the prisoner was brought out of Canada with the assent of the authorities of that country or not. If there were anything improper in the transaction, it was not that the prisoner was entitled to protection on his own account. The illegality, if any, consists in a violation of the sovereignty of an independent nation. If that nation complain it is a matter which concerns the political relations of the country, and that aspect is a subject not within the constitutional powers of this court."

Dows' Case, reported in 18 Pa. St. 37, was before the supreme court of the neighboring state of Pennsylvania in the year 1851, in many of its features is quite similar to the one under consideration. The prisoner was indicted for forgery in the county of Alleghany. It being ascertained that he was in the state of Michigan, a requisition was made by the governor of Pennsylvania upon the executive of that state for his surrender. In pursuance thereof, the governor of Michigan issued his warrant to arrest and surrender Dows to the authorities of Pennsylvania. Afterwards he was arrested at Detroit by the officers of a steamboat, when on board of said boat, and was carried to Erie, in Pennsylvania, and there delivered to the sheriff of Erie, and conveyed to Pitts-

burgh, and lodged in jail. The officers of the boat had no warrant in their hands at the time of the arrest. The sheriff of Erie county was also without warrant. A writ of habeas corpus was issued by the supreme court at the instance of the prisoner, claiming that he was entitled to be discharged from custody on account of the defect in the mode of his original arrest. Chief Justice Gibson delivered the opinion of the court, and said they would have been bound to let the prisoner go free if his release had been demanded by the governor of Michigan, but, as he had not demanded it, the illegality of the capture could not be set up by the fugitive. The supreme court of Iowa, in State v. Ross, 21 Iowa, 467, held that it was no defense to an indictment charging the defendants with crime committed in Iowa that they were arrested without authority in Missouri, and wrongfully brought within the jurisdiction of Iowa. "It may be conceded," remark the court, "that the prisoners were arrested in Missouri, and carried into this state, by force and against their will, by parties acting without authority. After being thus brought to the state, however, they were turned over to the civil authorities, and proper steps taken for their detention and trial. * * * The claim is that the prisoners were brought within the jurisdiction of the state by fraud, violence, and without any semblance of authority, and that comity to the rights of sister states, a just appreciation of the rights of the citizen, and a due regard for the integrity of the law and its administration demand that the court should, under such circumstances, refuse its aid, and, indeed, that there can be no rightful exercise of jurisdiction over those thus arrested. * * * The liabilities of the party arresting them without legal warrant, for false imprisonment or otherwise, and their violation of the penal statutes of Missouri, may be ever so clear, and yet the prisoners not be entitled to their discharge. * * * That our laws have been violated is sufficiently shown by the indictment; for this the state has a right to detain the prisoners, and it is of no importance how or where their capture was effected."

No reference has been made to the cases of U. S. v. Caldwell [Case No. 14,707], U. S. v. Lawrence [Id. 15,573], Com. v. Hawes. 4 Am. Law J. 524, or to the opinion of Lindsay, C. J., affirming the judgment of the inferior court in the last stated case. reported in 13 Bush, 697, all of which were so fully discussed in the argument, because in my judgment, they are not pertinent to the present inquiry. They all turn upon the construction of the treaty between the United States and Great Britain in regard to the extradition of fugitives from justice, and involve the authority of the courts to hold a surrendered fugitive for trial. for any other than extraditable offences. It may, however, be remarked in reference to this question that, by the second clause of the sixth arti-

cle of the constitution of the United States, treaties are declared to be the supreme law of the land; and by the second section of the third article, they are brought as directly within the judicial power as cases in law and equity, arising under the constitution and laws of the United Sta.es. Unless, therefore, there was something in the treaty with Great Britain which required the aid of legislative provisions to give it effect (see [Foster v. Neilson] 2 Pet. [27 U. S.] 253), it is somewhat difficult to understand or indorse the reasoning of the learned judge who decided the Cases of Caldwell and Lawrence [supra], and especially where he asserts that complaints of the abuse of extradition proceedings do not form a proper subject of investigation in the courts of the United States.

It is the conclusion of the court, upon principle and authority, that the state court has the right to hold the prisoner for trial for the offences charged against him, without reference to the circumstances under which his arrest was made in a foreign jurisdiction. It necessarily follows that there is no authority here to discharge him on the habeas corpus. Neither the constitution of the United States nor the 753d section of the Revised Statutes makes any provision for the writ in such a case, and the prisoner must be remanded.