Johnson, C. J.
The demurrer to the plea presents the question, whether the facts stated exempted the aepused from prosecution in Belmont county until a reasonable time has elapsed after the expiration of their sentence for the crime committed in Butler county.
The State had obtained possession of the accused under the authorities of Canada under the provisions of the Ashburton Treaty, for trial in Butler county. They were there tried, convicted and sentenced for the crime upon which they were extradited. Before the expiration of this sentence, the State sought to place them on trial for another crime, charged to have been committed before extradition in Belmont county, the'latter crime being one for which the accused might have been extradited.
The court of common pleas held, that proceedings on the indictment in Belmont county must be suspended until a reasonable time after the expiration of the sentence in the Butler county case; or, in other words, that the State having obtained possession of the criminals, under the Extradition Treaty, could not detain them in custody and put them on trial for another crime. It was also held, that the obligations of this treaty created a personal right in favor of the person extradited, which he could plead in suspension of. a prosecution for such other crime.
By the 10th Article of the Ashburton Treaty it was “agreed that the United States and her Brittanic Majesty shall, upon mutual requisitions by them or their ministers or authorities respectively made, deliver up to justice all persons who, being charged with the crime of murder, or with assault *275 with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper committed within the jurisdiction of either, shall seek an asylum, or be found within the territories of the other: Provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had been there committed; and the respective judges and other magistrates of the two governments, shall have power, jurisdiction and authority,, upon complaint made under oath, to issue- a warrant for the apprehension of the fugitive, or person so charged, that he may be brought before such judges or other magistrates respectively — to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitives. The expense of such apprehension and delivery shall be borne and defrayed by the party who makes the requisition and receives the fugitive.”
Independent of treaty stipulations, the obligations to sui’render fugitives from justice was of an imperfect nature. It rested on comity between states. Each determined for itself the extent of this obligation, and the nature of the crime and mode, of surrender.
Prior to as well as since the treaty of 1842 it has been the settled policy of both the United States and Great Brittain to furnish an asylum for persons charged in other states with religious or political offenses. Each zealously vied with the other in maintaining this right of asylum. Hence it was that in the treaty of 1842 it was expressly limited to seven well defined crimes. Hence it was, also, that the right to demand a surrender in the specific cases named was so carefully guarded. The accused was protected in his asylum, unless the, authorities there should find him guiltly of one of the crimes specified in the treaty.
*276 < By the terms of the treaty, the judge or other magistrate of the government upon' whom the demand was made is to hear and ¡determine, according to the laws of his own country, whether there is a case made, and, if so, to report to the proper executive authority who shall issue a warrant for his extradition.-
The right of the United States to demand the surrender of fugitives from justice found within the British dominions is purely conventional; hence the correctness of the ruling of the court below depends on the true construction of the treaty, and also how far the judicial tribunals of the demanding government are required to give effect to treaty stipulations, especially how far the judicial tribunals, federal and state, can take cognizance of and enforce the provisions of the treaty upon the plea of the person surrendered.
In United States v. Caldwell, 8 Blatchf. 131, and United States v. Lawrence, 13 Blatchf. 295, Judge Benedict held, that while the abuse of the provisions of the treaty, or want of good faith by the demanding government, might furnish cause of complaint by the surrendering government, yet such complaints do not form a proper subject for judicial cognizance. See, also, Adriance v. Lugrave, 59 N. Y. 110. Other cases to the' same effect might be cited, but as the decisions and the views of writers upon the subject differ so widely, we are free to determine the questions from the terms of the treaty itself, guided by the well established rules for the construction of such instruments.
By section 2, Art. 6, of the Constitution of the United States, “ This constitution, and the laws of the United States, made in pursuance thereof, and all treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land, and the judges of every state shall be bowrld thereby, anything in. the constitution and laws of any state, to the contrary notwithstanding.”
This treaty is therefore the, law of the land, and the judges of every state are' as much bound thereby as they are by the constitution and laws of the Federal or State governments. It is therefore the imperative duty of the judicial tribunals of Ohio to take cognizance of the rights of persons arising *277 under a treaty to the same extent as if they arose under a statute of the state itself.
' While authority is not wanting. to support the decisions in CaMweWs case, and Lawrences case, supra, yet, we submit that these decisions ignore the provisions of ,the Federal Constitution just cited.
Again, if it be true, that the abuse of extradition proceedings, under this treaty, is an offense for which the surrendering government alone can complain, the remedy is totally inadequate, and the treaty itself may be rendered nugatory.
When, as in the present case, the surrender is to one of the states of the United States, the prisoner passes beyond the control of the Federal government and into that of this state. Upon complaint made by the British government to the Federal government of an abuse by the state of Ohio, of the process under the treaty, the Federal government could only answer, as it has done in many instances heretofore, that under our system of state and Federal government, the latter is powerless to control the state authorities. If the right under the treaty to be protected from other prosecutions can only be enforced by the surrendering nation by protest or otherwise against the one making the demand, that is, if it is a question not cognizable in the courts, it is of little value under our system of Federal and state governments.
After the United States has secured the surrender, for an offense against state law, the accused is delivered to the authorities of the state for prosecution, when all Federal control is lost. If the accused is of little or no political influence, the difficulty of giving him that protection which was intended by the treaty is so great, if the courts cannot intervene, that it is of little or no value as a protection to the person extradited. We conclude, therefore, and both reason and the weight of authority support this view, that the judges of this state are bound by the provisions of this treaty, and that if it secures to the person extradited exemption from trial for crimes and offenses other than those specified in the warrant of extradition; it is the duty of the courts to take cognizance of his plea. Foster v. Neilson, 2 Pet. 253; Commonwealth v. Hawes, 13 *278 Bush, 700; Winslow's case, 10 Am. Law Rev. 617; United States v. Watts, 8 Sawyer, 370, 14 Fed. Rep. 130; North Am. Rev., May, 1883, page 497.
II. As to the right of the demanding government to hold the accused and prosecute him for a different crime or offense.
This treaty is to be subject to the same -rules for ascertaining the intention of the contracting parties, as in ease of other contracts. It enumerates seven well defined crimes for which extradition may be had. It thereby excludes all non-enumerated crimes and offenses, whether of a political or other character, and leaves the surrender in such other cases to the discretion of the government where he is found. It limits the duty of surrender to those cases specified in the treaty, in which the evidence of guilt is sufficient, according to the laws of the nation where the fugitive or person charged is found, to justify his committal for trial, if the act charged had been committed there. The right of the nation where the fugitive is found to first hear and determine the case, and to decide upon the evidence whether according to its own laws the crime charged has been committed, i. e., whether a case for committal has been made out, secures to the government upon which the demand has been made the right to determine for itself whether the demand shall be complied with. This necessarily excludes the idea that the demanding government can decide for itself to try the prisoner, after obtaining custody, for other crimes; otherwise the purpose of the treaty is defeated. If the demanding government can so decide, the whole intention of the treaty could be defeated, and the right of asylum, which has been the boast of both governments, would depend entirely on the action of the demanding government.
To extradite under the treaty for an offense named therein, and then to retain the prisoner for a n on-extraditable offense, or for a different one, though extraditable, upon which no hearing had been had as provided in the treaty, would be, not only a breach of good faith by the demanding, government, but a violation of the right of asylum in favor of the accused guar *279 antied to liim by the treaty. The sole object of the treaty was to enable each government to protect its citizens and inhabitants in the right of asylum, except they come within the provisions named. The legislation of both governments clearly supports this construction.
By the act of Gongress of 1841, United States Rev. Stats., section 5272, “'It shall be lawful for the Secretary of State, under his hand and seal of office, to order the person so committed to be delivered to such person as shall be authorized in the name and behalf of sucli foreign government, to he tried for the crime of which such person shall he so accused.”
Again, by section 5275, “Whenever any person is delivered by a foreign government and brought into the United States and tried for any crime of which he is duly accused,” it is the duty of the President to take proper measures for his “ transportation and safe-keeping until the conclusion of his trial, for the crimes or offenses specified in the warrant of extradition, and until his final discharge from custody or imprisonment, for or on account of such crimes or offenses, and for a reasonable time thereafter, and may. employ such portion of the land or naval force of the United States or of the militia thereof as may be necessary for the safe keeping and protection of the accused.”
In like manner, the British Parliament in 1843, for the purpose of carrying into effect this treaty, enacted that the person to be extradited should be delivered to the person authorized 'by the United States to receive him, “ to be tried for the crime of which such person shall be accused.”
While legislative interpretation of statutes-is not conclusive upon the courts, yet in the case of a treaty which is in its nature a contract between nations, enactments like these by the high contracting parties, are of persuasive power in the construction of the treaty.
The right of the state of Ohio over the accused, who had sought an asylum in Canada, is derived from the provisions, express or implied, of the treaty of 1842.
In view of the provisions of this treaty, the safeguards *280 therein provided against the infringment of the right of asylum save in the specified cases, and the legislation by both governments to carry out those provisions, we think it clear that the court below did not err in refusing to put the accused on trial for a crime for which they were not extradited.
In the correspondence between the United States and Great Britain, which took place in 1867, growing out of the refusal of the latter to surrender Winslow, except upon a stipulation by the former that he should not be tried for another offense, the conflicting views of the two governments are stated. Winslow had been demanded as- a fugitive, charged with forgery. Great Britain refused to deliver him unless the United States would stipulate that he should not be tried except for the crime charged. This was refused, and an extended correspondence was the result. Finally, the British government, as a temporary measure and until a new treaty was made, suspended its claim to require such a stipulation.
Time will not permit an analysis of the claims of the two governments. It is sufficient to say that it discloses- a contrariety of views by eminent statesmen and publicists upon the question at issue, and that the refusal by the United States to make the stipulation demanded was based chiefly on the ground that the demand was unusual, and was a reflection ¡upon our government, after a successful execution of the treaty ■for near forty years without such a stipulation.
If it be conceded that the United States asserted the right to retain an extradited prisoner, and try him for another crime, that claim is not conclusive upon the courts. Nothing was then settled as to the true construction of the treaty.
If, -as we hold, the question is one of personal right under the treaty, .as -well as of international law, it follows that the courts can hear .-and determine such right when it is invaded.
Much more .might be said in support of our conclusions, but we content ourselves with a reference to the following decisions and -discussions on the subject: Commonwealth v. Hawes, 13 Bush, 697; United States v. Watts, 14 Fed. Rep. 130; Letter of Wm. Leach Lawrence on “Extradition,” 19 Albany Law J. 339.; North Am. Rev., May, 1883, page 197, *281 title “ Extradition; ” Wliart. Orim. Plead. & Prae. §§ 38-57, and cases noted; Blanford v. State, 10 Texas, 627; Matter of Cannon, 47 Mich. 481; Spear on Extradition, cli. 4, pp. 65-74; 10 Am. Law Rev. 617; Compton, Ault & Co. v. Wilder, 40 Ohio St. 130.

Leme refused.