STATE ex rel. BROWN vs. STEWART, Circuit Judge, etc.

*April 17 — May 15, 1884.*

*(1) Interstate extradition: Arrest and trial for another offense. (2) What is a " crime." (3) Constitutional law: Trial by jury of " county or district " where offense committed. (4) Docket entries by committing magistrate.*

1. In the absence of any compact or other arrangement between the states, a person extradited from one state to another for a certain offense, after being tried, acquitted, and discharged may be arrested and tried for another offense before he is allowed to return to the state from which he was brought.

2. The words "treason, felony, or other crime," as used in sec. 2, art. IV, Const. of U. S., and in sec. 5278, R. S. of U. S., embrace every act forbidden and made punishable by a law of the state.

3. The statute (sec. 4618, R. S.) providing that offenses committed within one hundred rods of the dividing line between two counties may be prosecuted and punished in either, is not in violation of sec. 7, art. I, Const., securing to the accused the right to a trial " by an impartial jury of the *county or district* wherein the offense shall have been committed; which *county or district* shall have been previously ascertained by law."

4. The custody of a prisoner on commitment is not illegal because the committing magistrate failed to make the same docket entries of adjournments, etc., during the preliminary examination, that he would be required to make upon the trial of a cause before him.

CERTIORARI to the Judge of the Ninth Judicial Circuit. The case is thus stated by Mr. Justice CASSODAY:

" The relator was arrested in Indiana upon a requisition issued by the governor of Wisconsin, upon a complaint in justice's court, Columbia county, Wisconsin, charging him with embezzlement of property belonging to James Gowan, in that county. He was brought into that county, and was tried for that offense upon an information filed in the circuit court for that county, and upon the trial was acquitted, and discharged by the court. Immediately thereafter, and before he had time to leave the court-room, he was arrested

upon a warrant issued by a justice of the peace of that county, upon a complaint for obtaining property, to wit, a horse, from Edward Lee, by false pretenses, in that county, and was taken before a justice of the peace therein for examination, December 29, 1883. Thereupon the justice adjourned the hearing, and entered such adjournment in his docket as follows: 'December 29, 1883, 9 A. M. The witnesses for the state not all being present, the court took a recess until one o'clock P. M.' At one o'clock P. M., the · parties all being present, the justice proceeded with the examination, and afterwards committed the defendant to the county jail of said county to await his trial.

" Whatever representations were made by the relator, constituting the false pretenses alleged, were made at Portage, in Columbia county, and thereafter the relator went to the county of Sauk, but within twenty rods of the boundary line between that county and Columbia county, and obtained the horse.

"While the relator was being held by the sheriff on the last-mentioned charge, he was brought before Hon. ALVA STEWART, judge of the circuit court for Columbia county, on *habeas corpus*, and, after a hearing thereon, he was ordered by that judge into the custody of the sheriff of that county. To review that order he sued out this writ."

For the relator there was a brief by *Stroud, Armstrong & Stroud*, and oral argument by *Mr. W. S. Stroud*. They contend, *inter alia*, that the criminal offense of obtaining goods by false pretenses is complete in the county where the property is delivered and obtained. *State v. House*, 55 Iowa, 466; *Norris v. State*, 25 Ohio St., 217; *Stewart v. Jessup*, 51 Ind., 413; *People v. Rathbun*, 21 Wend., 509; *People v. Sully*, 5 Parker's Cr. Rep., 142; *In re Eldred*, 46 Wis., 551; Archb. Cr. Pr. & Pl. (8th ed.), 223; 2 Starkie on Ev. (Am. ed. 1837), 897, note *l*. Sec. 4618, R. S., is in contravention of sec. 6, art. I, Const. *Armstrong v. State*, 1 Cold., 338; *Swart v.*

*Kimball,* 43 Mich., 443; *In re Eldred,* 46 Wis., 548; *State v. Pauley,* 12 id., 537. The word "district" in that section of the constitution is convertible with the word "county," or has no applicability, for there is no division of the state known as a district to which it could refer. *Weyrich v. People,* 89 Ill., 90; *Wheeler v. State,* 24 Wis., 52; *Armstrong v. State,* 1 Cold., 338. The justice lost jurisdiction by his failure to make the proper docket entry of the adjournment. *Witt v. Henze,* 58 Wis., 244; *Brahmstead v. Ward,* 44 id., 591; *Grace v. Mitchell,* 31 id., 533; *Crandall v. Bacon,* 20 id., 639; *Brown v. Kellogg,* 17 id., 475.

For the respondent there was a brief by *H. H. Curtis,* District Attorney of Columbia county, and the cause was argued orally by *H. W. Chynoweth,* Assistant Attorney General.

CASSODAY, J. 1. It is claimed that the arrest for the last offense was illegal because it was made immediately after the relator had been tried, acquitted, and discharged on the offense upon which he had been brought to the state from Indiana on the requisition of the governor, and before he had time to return.

Treaty stipulations between nations frequently guaranty to the fugitive the right to leave the demanding country after the trial for the offense for which the fugitive has been surrendered, in case of acquittal, or in case of conviction after his endurance of the punishment. When not so guarantied it is sometimes made the subject of executive pledge. Wharton on Confl. of Laws, §§ 835, 844, 846. It has been held that an extradited fugitive cannot be held in violation of such treaty or pledge to answer for any other offense than the one for which he had been surrendered. *U. S. v. Watts,* 14 Fed. Rep., 130; *Comm. v. Hawes,* 13 Bush, 697. But in the absence of such treaty stipulation it has been held that there is no implied obligation to delay

the arrest for such other offense. *Adriance v. Lagrave*, 59 N. Y., 110; *U. S. v. Caldwell*, 8 Blatchf., 131; *U. S. v. Lawrence*, 13 Blatchf., 295. So it has been held to be no ground for releasing a prisoner who had escaped from the state into Canada and been forcibly brought back to the state and there arrested without the assent of the authorities of Canada. *State v. Brewster*, 7 Vt., 118; *People v. Rowe*, 4 Parker's Cr. Rep., 253; *Dows' Case*, 18 Pa. St., 37.

Here no treaty stipulation to guaranty return is involved, and hence cases of international extradition arising under such treaties are not applicable. *Ham v. State*, 4 Tex. App., 645. This is a case of interstate extradition, and arises under the constitution and laws of the United States. "A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime." Const. of U. S., art. IV, sec. 2. The act of Congress is of the same import, and provides that a copy of an affidavit made before a magistrate of the state from whence the person so charged has fled, properly certified, shall be sufficient to authorize such demand, arrest, and delivery. Ch. 198, R. S. of Wis., and sec. 5278, R. S. of U. S. The act, however, is wholly silent as to any delay in arresting the prisoner upon any different charge after he has been acquitted, or after he has endured the punishment for the offense for which he was extradited. It contains no provision securing to the fugitive any right of return. This distinction between international and interstate extradition seems to be very marked. True, the learned judge who wrote the opinion in *Cannon's Case*, 47 Mich., 486, cited by counsel, said: "We do not perceive any ground for the distinction." But the difference between such treaty stipulations, and the constitution and laws of the United States, was not even mentioned, and no authority

was cited, nor argument advanced, to prove that there was none. On the contrary, the learned judge said: "We do not deem it necessary to refer at large to the decided cases which were cited on the hearing. They cannot be reconciled in principle,— although very few of them would conflict with our views on so plain a case as the present." The learned judge and the court were evidently impressed with the features and circumstances of the arrest in that particular case which distinguished it from the cases there cited by counsel. It has frequently been held in effect, however, by courts of equal ability, that a fugitive from justice extradited under the constitution and laws of the United States, on the charge of the commission of a specific crime, and discharged therefrom, can be held by the courts of the state to which he is surrendered, for another and entirely different crime. *In re Noyes*, 17 Alb. Law J., 407; *In re Miles*, 52 Vt., 609; *Ham v. State*, 4 Tex. App. 645; *Williams v. Bacon*, 10 Wend., 636; *Browning v. Abrams*, 51 How. Pr., 172; *Dows' Case*, 18 Pa. St., 37.

The interstate extradition clause of the constitution was never intended for the benefit of fugitives, nor to enable them to escape just punishment for their offenses. On the contrary, it was to secure the apprehension of any who should escape the jurisdiction wherein his offense had been committed. It was, in effect, a compact between the states upon a subject purely local, and as to which each would otherwise have been an independent sovereignty, that in case any person charged with crime in one state fled into another, such other should, on demand of the executive of the former, cause him to be arrested and secured, if found therein, and delivered up to the agent of the former to be removed to the state from which he so fled. It was, in effect, a pledge from every state to each of the others, incorporated into the organic law of the nation, that it would become, to a certain extent, an agency in the administration

of the laws of every other state against treason, felony, or other crime, as to all such criminals as should come within its borders. By it, each state agreed not to willingly become a refuge for the criminals of any other, and not to allow any guilty person to go unpunished by its aid or connivance. This duty each state voluntarily assumed. The crime being committed, the offense properly charged, and the demand being properly made, the act of Congress referred to says "it shall be the duty of the executive authority of the state" to cause the fugitive to be arrested and secured, and to be delivered to the agent of the state from which he fled. "The performance of this duty, however," said TANEY, C. J., "is left to depend on the fidelity of the state executive to the compact entered into with the other states when it adopted the constitution of the United States, and became a member of the Union. It was so left by the constitution, and necessarily so left by the act of 1793. . . . But if the governor of Ohio refuses to discharge this duty, there is no power delegated to the general government, either through the judicial department or any other department, to use any coercive means to compel him." *Kentucky v. Dennison*, 24 How., 109. To the same effect, *Taylor v. Taintor*, 16 Wall., 370; *Ex parte Virginia*, 100 U. S., 347, 359; *Ex parte Siebold*, 100 U. S., 391. "But if he act," said Mr. Justice SWAYNE in *Taylor v. Taintor*, *supra*, "and the fugitive is surrendered, the state whence he is removed can no longer require his appearance before her tribunals, and all obligations which she has taken to secure that result thereupon at once, *ipso facto*, lose their binding effect."

Thus it appears that the state demanding and the state delivering are each under a reciprocal duty to the other, the performance of which depends upon their respective fidelity to the mutual obligations resting upon them. But the state of Indiana is not here complaining of any violation of duty, nor that any of its sovereign rights have been outraged. It

State ex rel. Brown vs. Stewart, Circuit Judge, etc.

is the fugitive who makes complaint, and in the name of Indiana asks that he may be restored to that state from which he was extradited. He does this under an agreement or compact between the two states, not made to secure his escape from punishment, but to insure his trial, notwithstanding he has fled the state, in case he is charged with a crime. Here the relator was extradited because he was so charged. For that offense he was tried, acquitted, and discharged. The record discloses no executive pledge guarantying his return. After his discharge he was arrested for obtaining property under false pretenses. He now asks to be discharged because he was not allowed time to return to Indiana before being arrested for the second offense.

In *Cannon's Case*, 47 Mich., 486, the prisoner was taken from Kansas to Michigan on a requisition of the governor of the latter state on the criminal charge of seduction committed in that state. On being thus brought into Michigan he was taken before a justice of the peace, December 12, 1881, on the warrant for the seduction, for examination. The hearing was adjourned for cause to December 27, 1881. Before the hearing, and while the prisoner was out on bail, to wit, December 16, 1881, the prosecuting attorney commenced bastardy proceedings for the same transaction involved in the previous complaint for seduction, and thereupon a warrant was issued and he was arrested, December 17, 1881. To that charge he refused to plead. December 27, 1881, he was brought before the magistrate on the charge of seduction, which was at once discontinued on the admitted ground that it was not founded on any legal reasons. Thereupon the prisoner was released by the supreme court on *habeas corpus* from detention in the bastardy proceedings. The court held that he was in legal duress at the time of the arrest in the bastardy proceedings, and in that the case is distinguishable from the one before us. The court also held, in effect, that bastardy was not such an offense as would

have authorized extradition. If that was so, it was a strong and additional reason for holding the arrest illegal. *U. S. v. Watts*, 14 Fed. Rep., 130. The court also intimated, if it did not hold, that the charge of seduction was resorted to without any legal ground therefor, and in bad faith, merely to get the prisoner within the state. *Williams v. Bacon*, 10 Wend., 636. Here there is no intimation of any bad faith.

Whether obtaining property under false pretenses is a "crime," within the meaning of that word as used in the constitution and laws of the United States, is a question properly for consideration. It seems to be settled that the words "treason, felony, or other crime," as there used, "embrace every act forbidden and made punishable by a law of the state. The word 'crime' of itself includes every offense, from the highest to the lowest in the grade of offenses, and includes what are called *misdemeanors*, as well as treason and felony." 24 How., 99; *People v. Donahue*, 84 N. Y., 438; *Morton v. Skinner*, 48 Ind., 123; *In re Voorhees*, 32 N. J. Law, 141. This rule was adopted by the present chief justice in *In re Hooper*, 52 Wis., 701, 702, and is abundantly supported by the authorities there cited. The obtaining of property under false pretenses is clearly a crime in this state (R. S., sec. 4422), and, being so, there can be no question but what it is a crime within the meaning of that word as used in the constitution and laws of the United States.

It follows that the relator might have been again extradited had he been allowed to go to Indiana after being discharged on the first offense. This being so, there seems to be no practical reason for holding that the relator could not be legally arrested immediately upon his discharge from the first offense, instead of being allowed to escape the state and then brought back on requisition. Such an arrest, in such a case, was certainly not in violation of any law of the United States. It was not in conflict with any agreement between the states. It was no breach of any executive

pledge. It was no interruption of any comity between the states. We must therefore hold that the arrest was not illegal by reason of any of the objections mentioned.

2. It is claimed that, although the alleged misrepresentations were made in Columbia county, yet that the arrest was illegal because the property, when obtained, was twenty rods beyond the boundary line of that county. The statute provides that offenses committed within one hundred rods of the dividing line between two counties may be alleged in the information to have been committed in either of them, and may be prosecuted and punished in either county, and the court of either such county, whose process shall have been first served upon the defendant, shall have priority of jurisdiction. R. S. 1849, ch. 141, sec. 7; R. S. 1858, ch. 172, sec. 7; R. S., sec. 4618. It is urged that this statute is in conflict with the provision of the constitution which secures to the accused the right "to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law." Sec. 7, art. I. This provision was embodied in the same title of the Revised Statutes of 1849 as the above section. R. S. 1849, ch. 132, sec. 2. Assuming that the obtaining of the property was essential to the completion of the offense, yet it was in part, at least, committed in the county of Columbia. *Wilcox v. Nolze*, 34 Ohio St., 520. This being so, the constitutional question involved is very much like the one in *State v. Pauley*, 12 Wis., 537, where it was held that a statute was constitutional which provided that if any mortal wound be given in one county, by means whereof death shall ensue in another county, the offense may be prosecuted in either county. R. S. 1849, ch. 141, sec. 8; R. S. 1858, ch. 172, sec. 8; R. S., sec. 4619. Both of "these sections," said the late chief justice, "were framed by very intelligent gentlemen, some of them being distinguished members of the bar, in

the same year in which the constitution was adopted; and they are plainly founded on the clause of the constitution in question." *In re Eldred*, 46 Wis., 549. Of course, where the offense is partly committed in each county and wholly in neither, as where it is committed right upon the line between two counties, there must be jurisdiction somewhere, and at common law it seems to have been in either county. 2 Whart. Crim. Law (7th ed.), § 2141.

But assuming that the offense was committed at the place where the horse was obtained, and not where the representations were made, yet we are of the opinion that the courts of Columbia county had jurisdiction. These sections of the statute having been adopted in the same year as the constitution, and the constitutional clause having been embodied in the same title with these sections by the revisers of the statutes of 1849 and the legislature which adopted them, show pretty clearly that the words " or district," as used in this clause of the constitution, were intended by the framers of that instrument, and understood by all at the time, to mean something different than the word " county " as therein used; especially when taken in connection with the words " which county *or district* shall have been previously *ascertained by law.*" From this, it appears to be competent for the legislature to change the boundaries of the districts without changing the boundaries of the counties. For, as observed by RYAN, C. J., in the case above cited, " the words ' county ' or ' district,' as used in the clause, must both be held to have a meaning and a use." 46 Wis., 548. Giving to each such distinct meaning and use, and there seems to be no difficulty in holding that each criminal district, as ascertained by the laws now in force, extends one hundred rods beyond the boundaries of each county.

Whether a juryman residing outside of the county, but within one hundred rods of the county line, and hence within the district, would for that reason be incompetent, or

a subject of peremptory challenge, is a question not here presented. "This very peculiar language" of the constitution, said the late chief justice, "is obviously designed to avoid the difficulties which had arisen at the common law, without depriving the accused of *trial by a jury of the vicinage*." 46 Wis., 548. Of course, no one would insist upon a construction which would require every juryman in every criminal case to be a resident of the very place where the crime was committed. On the contrary, most of them must necessarily reside quite remotely from such place. The constitutional right secured is that they shall all be taken from "the county or district wherein the offense shall have been committed." This constitutional provision does not undertake to define or limit the jurisdiction of the courts over criminal offenses, but simply defines and limits the locality from which a jury must be taken for the trial of such offenses, and secures to him the right of a trial within the same limits. This has been substantially held in Minnesota. *State v. Robinson*, 14 Minn., 453. See, also, *Wheeler v. State*, 24 Wis., 52. In Tennessee, the words "or district," in a similar constitutional provision, were treated, in view of their prior use, as a mere superfluity. *Armstrong v. State*, 1 Cold., 338. But, for the same reason, we feel bound to give them significance. If the clause in question was intended to absolutely define and limit criminal jurisdiction, then there could be no change of venue even on behalf of the prisoner. It is the "right" of the "accused" that the constitutional clause in question is dealing with, and not the jurisdiction of the courts. It is found in the article on the "Declaration of Rights," and not in the article on "Judiciary." No clause of this last article, or any other, has been pointed out which seems to limit such criminal jurisdiction to the precise boundaries of the county, and we find none. On the contrary, the constitution, in another article, speaks of "each county of this state organized for *judicial purposes*" (sec. 11, art.

VII), clearly indicating that a county may be organized as a county, and yet not organized as such for judicial purposes. Accordingly, there are several counties in the state organized for county purposes only, and yet each is attached to some other county for judicial purposes. The constitution seems to leave such criminal jurisdiction almost wholly to be regulated by statute.

We must therefore hold that the arrest was not illegal by reason of the property being obtained twenty rods outside of the boundaries of Columbia county; and that, notwithstanding that fact, the courts of that county, under the statute referred to, had jurisdiction to prosecute and punish the offense of which the accused is charged.

3. It is claimed that because the committing magistrate, on account of the absence of some of the witnesses on the part of the state, took a recess from nine o'clock A. M. to one o'clock P. M., without stating that the case was adjourned to that time *at his office*, he thereby lost jurisdiction. To support this contention several civil cases are cited. We do not understand that these cases are at all applicable. We are not referred to any statute requiring a committing magistrate to make the same docket entries that he must in a case of which he has jurisdiction to hear, try, and determine; and we are not aware of any case where the custody of the prisoner, on commitment in such case, has been held to be illegal merely because such entries have not been properly kept. The statutes regulating examinations and commitments seem to have been complied with. R. S., ch. 195. Besides, a mere irregularity in such commitment seems to be insufficient to authorize a discharge on *habeas corpus*. R. S., sec. 3429.

*By the Court.*— The order remanding the prisoner is affirmed.