Williams, C. J.
I. There is some conflict of authority upon the general question, whether, in a case of inter-state extradition the extradited person can lawfully be tried for any offense other than the one upon which he was surrendered, until he shall have had a reasonable time and opportunity to return to the surrendering state, after his trial and acquittal on the charge upon which he was extradited, or the expiration of his imprisonment under a conviction thereof; and there is, also, upon the same question, in cases of international extradition. It is not deemed necessary or important to enter upon an extended review or discussion, here, of the many cases on the subject. This court has held, that a person extradited under the treaty between the United States and Great Britain, known as the Ashburton treaty, cannot be prosecuted for a different crime than that specified in the warrant of extradition. State v. Vanderpool, 39 Ohio St. 273. And such has since been declared to be the law, by the Supreme Court of the United States. United States v. Rauscher, 119 U. S. 407. These decisions are based upon the interpretation of the treaty, and the acts of congress governing proceedings thereunder. The only provision of the treaty which relates to the extradition of criminals, is contained in the tenth article, which is as follows: “ It is agreed that the United States and Her Britannic Majesty shall, upon mutual requisitions by them, or their ministers, officers, or authorities, respectively made, deliver up to justice, all persons who, being charged with the crime of murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum, or shall be found, within the territories of the other; provided that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for *595 trial, if the crime or offense had there been committed; and the respective judges and other magistrates of the two governments shall have power, jurisdiction and authority upon complaint made under oath, to issue a warrant for the apprehension of the fugitive or person so charged, that he may be brought before such judges or other magistrates, respectively, to the end that the evidence of criminality may be heard and considered; and if, on such hearing, the evidence be deemed sufficient to sustain the charge, it shall be the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive.”
This provision of the treaty, and its effect, are discussed at some length by Mr. Justice Miller, in the opinion of the court in the case of the United States v. Rauscher, supra. After showing, that in' the absence of treaty, it was the recognized rule of public law that the country receiving the offender against its laws from another country had no right to proceed against him for any other offense than that for which he had been delivered up, and, that under the constitution, treaties made by the United States, become, like that instrument, and laws passed in pursuance thereof, the supreme law of the land, governing courts in appropriate proceedings for the enforcement of the rights of persons growing out of them, the learned justice proceeds to the discussion of the rights of a person extradited under the particular treaty in question. On that subject he says.: “ It is unreasonable to suppose that any demand for rendition framed upon a general representation to the government of the asylum, (if we may use such an expression,) that the party for whom the demand was made was guilty of some violation of the laws of the country which demanded him, without specifying any particular offense with which he was charged, and even without specifying an offense mentioned in the treaty, would receive any serious attention; and yet such is the effect of the construction that the party is properly liable to trial for any other offense than that for which he was demanded, and which is described in the treaty. There would, under that view of *596 the subject, seem to be no need of a description of a specific offense in making the demand. But, so far from this being admissible, the treaty not only provides that the party shall be charged with one of the crimes mentioned, to wit, murder, assault with intent to commit murder, piracy, arson, robbery, forgery, or the utterance of forged paper, but that evidence shall be produced to the judge or magistrate of the country of which such demand is made, of the commission of such an offense, and that this evidence shall be such as according to the law of that country would justify the apprehension and commitment for trial of the person so charged. If the proceedings under which the party is arrested in a country where he is peaceably and quietly living, and to the protection of whose laws he is entitled, are to have no influence in limiting-the prosecution in the country where the offense is charged to have been committed, there is very little use for this particularity in charging a specific offense, requiring that offense to be one mentioned in the treaty, as well as sufficient evidence of the party’s guilt to put him upon trial for it. Nor can it be said that, in the exercise of such a delicate power under a treaty so well guarded in every particular, its provisions are obligatory alone on the state which makes the surrender of the fugitive, and that that fugitive passes into the hands of the country which charges him with the offense, free from all the positive requirements and just implications of the treaty under which the transfer of his person takes place. A moment before he is under the protection of a government which has afforded him an asylum from which he can only be taken under a very limited form of procedure, and a moment after he is found in the possession of another sovereignty by virtue of that proceeding, but divested of all the rights which he had the moment before, and of all the rights which the law governing that proceeding was intended to secure. If upon the face of this treaty it could be seen that its sole object was to secure the transfer of an individual from the jurisdiction of one sovereignty to that of another, the argument might be sound; but as this right of transfer, the right to demand it, the obligation to grant it. *597 the proceedings under which it takes place, all show that it is for a limited and defined purpose that the transfer is made, it is impossible to conceive of the exercise of jurisdiction in such a case for any other purpose than that mentioned in the treaty, and ascertained by the proceedings under which the party is extradited, without an implication of fraud upon the rights of the party extradited, and of bad faith to the country which permitted his extradition.”
Answering the view which some authorities in this country have advanced, that, because the treaty contains no express stipulation limiting the right of the country in which the offense was committed to the trial of the offender for the particular crime for which he was extradited, he is, when brought into the country, liable to be tried for any offense against its laws, the learned justice says: “ This proposition of the absence of express restriction in the treaty of the right to try him for other offenses than that for which he was extradited, is met by the manifest scope and object of the treaty itself. The caption of the treaty, already quoted, declaring that its purpose is to settle the boundary line between the two governments; to provide for the final suppression of the African slave trade; adds, ‘ and for the giving up of criminals, fugitive from justice, in certain cases.’ The treaty, then, requires, as we have already said, that there shall be given up, upon requisitions respectively made* by the two governments, all persons charged with any of the seven crimes enumerated, and the provisions giving a party an examination before a proper tribunal, in which, before he shall be delivered up on this demand, it must be shown that the offense for which he is demanded is one of those enumerated, and that the proof is sufficient to satisfy the court or magistrate before whom this examination takes place that he is guilty, and such as the law of the state of the asylum requires to establish such guilt, leave no reason to doubt that the fair purpose of the treaty is, that the person shall be delivered up to be tried for that offense, and for no other.”
When, upon a demand made by a foreign government upon this country, it has been ascertained on the inquiry *598 had for that purpose, that a case is made for the extradition of the person demanded, it is made lawful for “ the Secretary of State, under his hand and seal of office,-to order the person so committed to be delivered to such person or persons as shall be authorized, in the name and on behalf of such foreign government, to be tried for the crime of which such person shall be accused, and such person shall be delivered up accordingly.” Revised Statutes of United States, sec-' tion 5272. And “ whenever any person is delivered by any foreign government to an agent of the United States, for the purpose of being brought within the United States and tried for any crime of which he is duly accused, the President shall have power to take all necessary measures for the transportation and safe keeping of such accused person, and for his security against lawless violence, until the final conclusion of his trial for the crimes or offenses specified in the warrant of extradition and until his final discharge from custody or imprisonment for or on account of such crimes or offenses, and for a reasonable time thereafter, and may employ such portion of the land and naval forces of the United States, or the militia thereof, as may be necessary for the safe keeping and protection of the accused.” Revised Statutes of United States, sec. 5275.
These are the only provisions of the acts of congress referred to in the decision of the cases cited, as having any bearing upon the question in hand, and they are not referred to as controlling the interpretation of the treaty, but'rather as confirming and emphasizing the construction it should receive independent' of those provisions. After a careful examination of the various decisions of the Federal and state courts on the subject, Mr. Justice Miller concludes his opinion on this question in the Mausoher Case as follows :
“ Upon a review of these decisions of the federal and state courts, to which may be added the opinions of the distinguished writers which we have cited in the earlier part of this opinion, we feel authorized to state that the weight of authority and of sound principle are in favor of the proposition, that a person who has been brought within the juris *599 diction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offenses described in that treaty, and for the offense with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been given him, after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings.” And Johnson, C. J., in the Vanderpool Case, by much the same process of reasoning, arrives at the same conclusion.
Some courts have attempted to distinguish between cases of international, and those of interstate extradition, holding, that while in the former, the extradited person cannot be tried for a different offense, he may be in the latter. This distinction is based upon a supposed guaranty of return contained in the treaty stipulations. The case of the State v. Stewart, 60 Wis. 587, was decided upon that theory. It is there said, that, “ Treaty stipulations between nations frequently guaranty to the fugitive the right to leave the demanding country after the trial for the offense for which the fugitive has been surrendered in case of acquittal, or in case of conviction after his endurance of the punishment. When not so guaranteed it is sometimes made the subject of executive pledge.” And it was held in that case, which was one of interstate extradition, that since the constitution and act of congress contain no provision securing to the fugitive the right of return, but are silent on the subject, the adjudications in cases of international extradition were not applicable. “ This distinction between international and interstate extradition,” says that court “seems to be very marked.” Notwithstanding this declaration of the court, we venture to inquire what foundation there is, if any, for the alleged distinction, especially between an interstate extradition and an extradition under the Ashburton treaty.
The provision of the constitution is, “ A person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall on demand of the executive authority of the state from which he *600 fled, be delivered up, to be removed to the state having jurisdiction of the crime.” Article 4, section 2, Constitution United States. Section 5278 of the Revised'Statutes of the United States, which is the act of congress relating to the surrender of fugitives from justice by one state to another, provides as follows : “ Whenever the executive authority of any state or territory demands any person as a fugitive from justice, of the executive authority of any state or territory to which such person has fled, and produces a copy of an indictment found or an affidavit made before a magistrate of any state or territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled, to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authorfly making such demand, or the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest,'the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing and transmitting such fugitive to the state or territory making such demand shall be paid by such state or territory.”
It is true, that neither the constitution, nor federal statute contains any express guaranty that the person surrendered shall not be tried for any crime except the one upon which he was surrendered, nor, that he shall be returned when discharged from custody on that charge. Neither does the Ashburton treaty contain such guaranty. The treaty, like , the constitutional and statutory provisions referred to, is silent on the subject; and its provisions are no more susceptible of a construction that will raise such guaranty by implication, than are those of the federal constitution and laws. Such construction of the treaty has never been claimed. The extent of the contention of those who assert the right of the demanding country to try the person extradited under *601 it for an offense different from the one on which the extradition was procured, is, that because there is no express limitation in the treaty restricting the right of the country in which the offense was committed to the trial of the offender for the crime specified in the warrant of extradition, he may, therefore, be tried for any violation of its criminal laws. This view has been sustained by some courts, but is, as we have seen, at variance with the decisions of this court and the Supreme Court of the United States. Neither of these decisions recognize the existence of an executive pledge of return of the extradited person; nor is any contained in the treaty or law. Certainly none can be found in the provisions of the treaty, and it is equally clear that none is contained in the acts of congress. Section 5275, of the Revised Statutes of the United States, has no other purpose or effect than to empower the President to use all necessary measures to protect those extradited, from lawless violence, until a reasonable time after discharge from custody under the charge specified in the warrant of extradition.
There appears, therefore, to be no foundation for any distinction, on the ground of guaranty or pledge of return, between an extradition under this treaty, and one between the states, with respect to the right of those extradited to exemption from trial for any other crime than that upon which the rendition was obtained. Nor, do we think there is, upon any other ground. It is evident, both the constitution, and the act of congress, contemplate that the demand made by one state upon another, shall be for the extradition of the accused person to answer the specific crime charged, and, that his surrender shall be for that purpose. In the language of the constitution, it is “ a person charged with a crime ” who shall be delivered up to be removed to the state “ having jurisdiction of the crime.” And the federal statute requires the application for the surrender to be accompanied by an authenticated copy of the indictment or affidavit charging the crime. The Ashburton treaty is not more definite in its requirement that the extradition thereunder shall be for a specific crime therein named. And, if, as said by Mr. *602 Justice Mileee, in Rancher’’s Case, it is unreasonable to suppose that any demand for rendition under the treaty, framed upon a general representation that the party was guilty of some violation of the laws of the country demanding him, without specifying any particular offense with which he was charged, would receive any serious attention, it is none the less unreasonable to suppose such general demand by one state upon another would be acceded to, or entertained.
The criminal laws of a state have no operation beyond its territorial bounds, and its jurisdiction to enforce them is equally limited. But for the provisions of the federal constitution, no state would be under obligation to surrender to another any person within its borders. The right of asylum in each, would be as complete and inviolable, as it is in independent nationalities in the absence of treaty stipulations. Extradition granted by one nationality to another*, in the absence of treaty, is matter of comity ; and, it is the settled doctrine, that in such case, the person surrendered can be held only for the offense for which he was extradited. And hence, we think, the reasons controlling the decisions of the Vanderpool and Rauscher Cases, and the grounds upon which those decisions rest, so far as they relate to the question before us, apply with equal force to interstate extraditions. And, in their application to the case under consideration, they lose none of their force if reference is had to our state legislation on the subject. Our statute providing for the surrender by the executive of this state, of fugitives from justice when demanded by any other state, requires the demand to be accompanied by a duly attested copy of the indictment or complaint, and also, by “ affidavits to the facts constituting the offense charged, by persons having knowledge thereof,” and “ by a statement in writing from the prosecuting attorney of the proper county, who shall briefly set forth all the facts of the case.” And before making the surrender, the governor may require the attorney general, or prosecuting attorney, to investigate the grounds of the demand, and report to him “ all the material facts which may *603 come to his knowledge, with an abstract of the evidence in the case.” The statute further provides, that in case the governor complies with the demand, the accused when arrested shall be taken before a judge, “ to be examined on the charge ; ” which judge shall “ proceed to hear and examine the charge, and upon proof made in such examination, by him adjudged sufficient, shall commit” the accused to jail to be delivered to the agent appointed to receive him. It is further required, as a condition precedent to the delivery of the accused to the agent, that the latter deposit with the clerk of the court a sum of money “ equal to ten cents a mile from the place where the arrest has been made, to the proper place for the prosecution; ” and, “ in case the supposed fugitive should not be found guilty of the crime charged in the warrant for his arrest, such deposit shall be paid to him.”
There could be no reason for the particularity required in the investigation of the specific crime charged in the warrant for the arrest, previous to the surrender, if the accused, when extradited, might be put upon trial for any other offense. And, that it was not contemplated he could be so tried, is further indicated by the provision requiring a deposit of money to be made with the clerk, which shall be paid over to the accused if he shall be acquitted of the charge. This not only recognizes the. privilege of return, but also his right to the reimbursement of his expenses in so doing.
One object of these statutory regulations, if not the only one, evidently was to limit, so far as it is within the power of the state to do so, the right of the demanding state to the trial of the surrendered fugitive for the particular crime for which his extradition was obtained; and it cannot be admitted that the legislative intent and policy thus declared, will be violated, or disregarded by this state, when acting in similar cases. It is our opinion, therefore, that a person surrendered to the authorities of this state, by another state or territory on extradition proceedings, cannot, while held in custody thereunder, be lawfully tried for any other crime *604 than the one upon which his extradition was obtained, unless he voluntarily waives his privilege.
II. Is the privilege waived by failure to plead it in abatement of the indictment for such different crime, or by entering a plea of not guilty thereto ? We think it is not, when, before the trial, the accused asserts his privilege, and objects to the trial on that ground. Properly speaking, the assertion by the accused of his privilege, or his objection to a trial on such indictment, is not in the nature of a plea in abatement. The office of that plea is to raise an exception to the indictment for some defect in the record which is shown by facts extrinsic thereto. Revised Statutes, sections 7248, 7250. But the privilege of the accused remains, though the indictment and record be unassailable. His right, is not to have the indictment set aside, but only to exemption from trial upon it. It is true, that in some cases of the kind, the plea in abatement has been resorted to as a mode of raising the question. But the manner of the. objection is not material, so it be interposed before the trial. Proceeding to trial without objection would undoubtedly be a waiver, for the privilege is personal and may be waived. But we are not satisfied that it is waived by failure to plead it in abatement, nor by entering a plea of not guilty. The maintenance of the privilege does not involve an attack on the indictment. ■ The court is simply without power to try the accused on such indictment against his objection. A plea that he is not guilty of the crime charged in the indictment, is not inconsistent with his right of exemption from trial upon it, and where that right is distinctly asserted in some mode, before trial, it comes, we think, in time. This was done by the prisoner before us, and his imprisonment is therefore unlawful.
III. The remaining question relates to the remedy; and that is, whether the prisoner can have an inquiry into the cause of his imprisonment, and a discharge therefrom, on habeas corpus. It is conceded that the writ cannot properly be employed for the review and correction of errors committed by courts while acting within the sphere of their author *605 ity. That must be done by a proceeding in error. But there can be no doubt that habeas corpus is the appropriate remedy to obtain discharge from imprisonment under an order or process of a court which it was without jurisdiction to mate or issue. The imprisonment of the petitioner in the penitentiary is of this character, and he is entitled to be discharged therefrom. But, as the indictment upon which he was extradited is still pending, he will be remanded to the custody of the sheriff to be held for further proceedings thereon.

Judgment accordingly.