## THE STATE vs. McDONALD.

*February 9 — March 19, 1901.*

*Criminal law and practice: Constitutional law: Trial: "District" where offense is committed: Illegal fishing: Catching fish for spawn: Agent of fish commissioners.*

1. Sec. 8, Stats. 1898 (giving to the counties bordering on the shores of Green Bay jurisdiction in common of all offenses committed on that part of said Green Bay which lies within the limits of this state), is not in violation of sec. 7, art. I, Const., providing that in all criminal prosecutions by indictment or information the accused shall enjoy the right to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law.

2. K., the owner of certain fishing tugs, etc., entered into a written contract with the commissioners of fisheries, through the superintendent thereof, to furnish said fishing outfits for the taking of fish for spawn in one of the outlying waters of the state. Subsequently said superintendent, in writing, authorized K. to permit defendant with his fishing tug to take fish for spawn on the same conditions that K.'s tugs were allowed to fish. Such permit was not delivered to the defendant, but remained in the possession of K., who instructed defendant to take white fish for spawn and deliver them to the superintendent. Thereafter the defendant with

The State vs. McDonald.

his tug engaged in taking fish which were turned over to the superintendent or his agent. Neither the superintendent nor his agent was ever present when such fish were taken, and on the day when the illegal fishing charged in the information was committed, both of them were absent from the place where they usually received the fish. The defendant, however, was complying in all respects with the conditions and requirements of K.'s contract with the commissioners. *Held*, that the defendant was an agent of the superintendent of fisheries, authorized in writing, within the meaning of sec. 15, ch. 311, Laws of 1899, authorizing the commissioners of fisheries, etc., to take fish at all seasons of the year from the outlying waters of the state for securing eggs for artificial propagation, etc., provided that "no such fish shall be taken except in the presence of the superintendent of fisheries or his agent authorized in writing."

REPORTED from the circuit court for Brown county: S. D. HASTINGS, JR., Circuit Judge. *First, second, and third questions answered in the affirmative; the others not answered.*

For the plaintiff there was a brief by the *Attorney General*, and oral argument by *R. F. Hamilton*, second assistant attorney general.

For the defendant there was a brief by *Sheridan & Evans*, attorneys, and *Calvert Spensley*, of counsel, and oral argument by *W. L. Evans* and *Calvert Spensley*. To the point that sec. 8, Stats. 1898, is unconstitutional, they cited *Dougan v. State*, 30 Ark. 41; *Buckrice v. People*, 110 Ill. 29; *State v. McGraw*, 87 Mo. 161; *In re McDonald*, 19 Mo. App. 370; *State v. Hatch*, 91 Mo. 568; *State v. Smiley*, 98 Mo. 605; *Armstrong v. State*, 1 Coldw. 338; *Craig v. State*, 3 Heisk. 227; *State v. Lowe*, 21 W. Va. 782, 45 Am. Rep. 570; *Olive v. State*, 11 Neb. 1; *Ex parte Crawford*, 12 Neb. 379; *State ex rel. Scott v. Crinklaw*, 40 Neb. 759; *Swart v. Kimball*, 43 Mich. 443; *State ex rel. Brown v. Stewart*, 60 Wis. 597; *In re Eldred*, 46 Wis. 548.

CASSODAY, C. J. The defendant having been tried and convicted of the offense charged, the presiding judge, before

The State vs. McDonald.

sentence and judgment, certified to this court six questions of law which had arisen upon the trial, and reported the case to this court so far as is necessary to present such questions of law pursuant to sec. 4721, Stats. 1898, to the following effect:

The defendant was brought to trial in the circuit court for Brown county upon a plea of not guilty to an information charging him with a violation of sec. 4561a, Stats. 1898. That information was based upon a preliminary hearing had before one C. W. Lomas, a circuit court commissioner in and for Brown county, by whom the defendant was bound over to the circuit court for trial. It appeared from the complaint upon which the preliminary hearing was so had, and upon the trial, that the alleged offense was committed upon the waters of Green Bay, in Wisconsin, about four miles west of Washington Island, forty miles, at least, from the nearest point of Brown county, and five miles, at least, from the nearest point of any other county than Door, which facts were at all times known to the complaining witness. The commissioners of fisheries of this state, by and through their agent, James Nevin, the superintendent thereof, had theretofore entered into certain agreements with one Albert Kalmbach, of Door county, for the taking of fish for spawn for the commissioners, which contracts were to the effect that Kalmbach on his part agreed to furnish for the use of the commissioners in obtaining spawn of lake trout and white fish his three tugs therein named, and his sailboats and gill nets, with outfits, as required in the waters of Sturgeon Bay, Green Bay, and Lake Michigan, with men to run the same and operate the nets, during such times in October and November, 1899, as the superintendent should direct, for the compensation therein named; the fish caught to be disposed of to pay the expenses. No fishing was to be done except by direction of the superintendent, and solely for the purpose of obtaining spawn, and the expenses of catch-

ing fish were not to exceed the value of the fish when sold. On or about November 11, 1899, James Nevin, as such superintendent, delivered to Kalmbach a certain permit in writing, of which the following is a copy:

"Detroit Harbor, Wis., Nov. 11, 1899.

"This permit will authorize A. Kalmbach to allow the McDonald Bros., with the fish tug Fish Hawk, to set nets to catch white fish to get spawn on the same conditions that his tugs are allowed to fish.         Jas. Nevin,

"Supt. Fisheries."

Such permit remained in the possession of Kalmbach until after the time of the alleged offense.   The defendant was a member of the firm of McDonald Bros., the owners and operators of the fishing tug known as the Fish Hawk.  After such permit was delivered to Kalmbach, the McDonald Brothers, with such tug, engaged in taking fish from the waters of Green Bay for the purpose of obtaining fish spawn for such commissioners, and such fish and spawn were, as often as the boat landed, turned over to James Nevin, or his agent, Frank Suthers, an employee of the commissioners.   Such fish were weighed by Nevin or Suthers, and delivered to Kalmbach, McDonald Bros. receiving from Kalmbach five cents per pound for all of the white fish so caught by them, and four cents per pound for all of the trout caught by them.   On November 22, 1899, the defendant and his copartner, Charles McDonald, together with two men employed and paid by them, comprised the crew of the fish tug Fish Hawk.   On that day they were fishing with nets for white fish in the waters of Green Bay, about four miles west of Washington Island.   In fishing for white fish about 2,600 pounds of trout and about 500 pounds of white fish were caught by the crew.   No spawn was taken. James Nevin was at the time in the general charge of the operations in Door county for the catching of spawn for the commissioners.   He or his agent, Suthers, was usually stationed at Detroit Harbor, the point from which said boat

went out for fish, and to which it returned with such fish; and all fish so caught were received from the defendant by Nevin or Suthers at that point, where they were weighed and delivered to Kalmbach. On the day of the alleged offense Nevin was at the city of Green Bay, and his agent, Suthers, was at the city of Sturgeon Bay, neither of them being at Detroit Harbor, where the fish tug Fish Hawk landed, nor were they or either of them on the fishing tug Fish Hawk at any time during the fishing in question. After November 11, 1899, and before the commission of the alleged offense, Kalmbach instructed the firm of McDonald Bros. to go to work getting white fish for spawn for the commissioners, and to deliver the same to Nevin or Suthers, and at the time of the commission of the alleged offense the defendant was in all things complying with the conditions and requirements of the contracts.

There was no conflict in the evidence offered by the state and the defendant. At the close of the evidence upon the trial the court refused to allow counsel for the defendant, after request for such privilege, to address the jury, on the ground that under the undisputed facts in the case as appeared from the testimony introduced by the state and the defendant the defendant was shown and admitted to be guilty of the offense charged in the information, and thereafter instructed the jury, which instructions, together with the remarks of the court to counsel preceding the charge, are attached to and made a part of the report. Thereafter the cause was submitted to the jury, and, after retiring and deliberating, a verdict of guilty was found by them. A motion to quash the information on the ground that the court was without jurisdiction was made on behalf of the defendant before the entering of the plea of not guilty.

The questions of law so certified, and upon which answers are desired, will be stated in their order.

· " *First.* Has the circuit court for Brown county jurisdiction of this prosecution ? "

It is conceded that the offense, if any, was committed upon the waters of Green Bay, in Wisconsin, and about four miles west of Washington Island, in Door county, and at least forty miles from the nearest point in Brown county. This being so, it is contended that the circuit court commissioner of Brown county had no jurisdiction to cause the arrest of the defendant for such offense, and bind him over for trial in the circuit court for Brown county, and that that court got no jurisdiction to try the case. The question raised is of great importance, and has received careful consideration. The constitution of this state provides:

" The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same." Sec. 1, art. IX, Const. Wis.; *J. S. Keator L. Co. v. St. Croix Boom Corp.* 72 Wis. 88–99.

The statute provides:

" The counties now or hereafter organized on the shores of Green Bay shall have jurisdiction in common of all offenses committed on that part of said Green Bay which lies within the limits of this .state. . . . And all offenses committed against this state on any part of said waters may be heard and tried in either of the counties having, as aforesaid, common jurisdiction over such waters where such offense may be committed in which legal process against the offender shall be first served, and may be alleged and shall be conclusively deemed to have been committed within such county; and all civil process from either of the counties aforesaid may be executed within and upon such waters as are within the jurisdiction of such county above given. In the construction of this section all wharves and piers shall be deemed part of the land with which they are connected." Sec. 8, R. S. 1878, and sec. 8, Stats. 1898.

The same section gives such common jurisdiction over offenses committed on the waters of Lake Michigan to the several counties bordering thereon, and over offenses com-

mitted on the waters of Lake Superior to the several counties bordering thereon, and over offenses committed on the Mississippi river to the several counties bordering thereon, and over offenses committed on the waters of Lake Winnebago to the several counties bordering thereon, and over offenses committed on the waters of St. Croix river and lake to the several counties bordering thereon. Thus it appears that six separate districts were created, and in each common jurisdiction over all offenses committed on the waters therein mentioned was given to the respective counties bordering thereon. Four of such districts were created immediately after the adoption of the constitution. Secs. 8–15, ch. 10, R. S. 1849, and secs. 8–15, ch. 13, R. S. 1858. The contention is that such statutes creating such districts and giving such jurisdiction in common in each are repugnant to the section of the constitution which declares that "in all criminal prosecutions " " by indictment or information " " the accused shall enjoy the right " " to a speedy public trial by an impartial jury of the county *or district* wherein the offense shall have been committed; which county *or district* shall have been previously ascertained by law." Sec. 7, art. I, Const. Wis.

If such contention is correct, then, as indicated, the legislation in this state has been at fault from the beginning. Other illustrations may be given. Thus the first legislature enacted that "counties organized for county, and not judicial, purposes " shall, when attached to counties organized "for judicial purposes, be deemed to be within the limits and part of the county to which they are attached." Sec. 3, ch. 10, R. S. 1849, and sec. 3, ch. 13, R. S. 1858. The same legislature also provided that "such portions of the state not organized into counties as are annexed to any organized county shall for judicial and other purposes be deemed to be within the limits and part of the county to which they are annexed." Sec. 4, ch. 10, R. S. 1849; sec. 4, ch. 13,

R. S. 1858. The same legislature also provided that "offenses committed on the boundary lines of two counties, or within one hundred rods of the dividing line between them, may be alleged in the indictment to have been committed in either of them, and may be prosecuted and punished in either county." Sec. 7, ch. 141, R. S. 1849, and sec. 7, ch. 172, R. S. 1858, and sec. 4618, R. S. 1878, and sec. 4618, Stats. 1898. So it has long been provided by statute that "whenever two counties are separated from each other by a river or a creek the middle of the main channel of such river or creek shall be the division line between them;" and "the counties so separated shall have common jurisdiction of all offenses committed on the waters between them, and all writs and process issued in any such county may be executed at any place on the waters of such river or creek opposite the county from which it was issued." Sec. 7, R. S. 1878, and sec. 7, Stats. 1898.

Shall all such legislation be condemned as unconstitutional and void? The adjudications in this state tend to support such jurisdiction. In *State v. Cameron*, 2 Pin. 490, the defendant was tried and convicted of manslaughter in Crawford county, where the offense was alleged to have been committed. The court simply held that there was no error in refusing to charge the jury to the effect that the defendant was entitled to an acquittal if they found that it had not been proved that the death took place in that county, and charging the jury, in lieu thereof, in effect, that it was sufficient if they found that the mortal wound was given in that county, and that the "deceased died anywhere upon the Mississippi within the jurisdiction of this state, and neither above nor below the county line bordering upon the river." This was put upon the ground that under the clause of the constitution quoted above the state had "concurrent jurisdiction" of the whole river bordering on this state. The question here presented did not arise in *State v. Pauley*, 12

Wis. 537, nor in *Wheeler v. State*, 24 Wis. 52, although Mr. Justice PAINE did comment on the use of the words " or district " in sec. 7, art. I, Const. Wis.   The same is true of *In re Eldred*, 46 Wis. 530, where the offending milldam was miles distant from the county line, although Chief Justice RYAN indulged in some comments on the same clause of the constitution, and, among other things, said:

" The words ' county or district,' as used in the clause, must both be held to have a meaning and a use.   It is unnecessary here to give an authoritative construction of the whole scope of the clause, but only so far as its construction is involved in the question under consideration.   The legislature takes express power to provide by statute for trial of offenses in the county or district in which the offenses shall have been committed."   Page 548.

And then, after referring to some of the sections of the statute quoted above, said:

" These sections were framed by very intelligent gentlemen, some of them being distinguished members of the bar, in the same year in which the constitution was adopted. And they are plainly founded on the clause of the constitution in question."   Page 549.

So far as his remarks go, they tend to support the validity of such legislation.   *State ex rel. Brown v. Stewart*, 60 Wis. 587, 595, 596.   In this last case, and on the assumption that the offense was committed outside of Columbia county, and within 100 rods of the county line, it was held " that the courts of Columbia county had jurisdiction."   Following the suggestion of Chief Justice RYAN, it was said in the same connection

— " that the words ' or district,' as used in this clause of the constitution, were intended by the framers of that instrument, and understood by all at the time, to mean something different than the word ' county,' as therein used; especially when taken in connection with the words ' which county *or district* shall have been previously *ascertained by law*.'   From this it appears to be competent for the legislature to change the boundaries of the districts without changing the bound-

aries of the counties. . . . Giving to each such distinct
meaning and use, and there seems to be no difficulty in hold-
ing that each criminal district, as ascertained by the laws
now in force, extends one hundred rods beyond the bound-
aries of each county. . . . This constitutional provision
does not undertake to define or limit the jurisdiction of the
courts over criminal offenses, but simply defines and limits
the locality from which a jury must be taken for the trial
of such offenses, and secures to him the right of a trial
within the same limits." Pages 596, 597.

That decision was based upon the theory that the offense, in
any view of the facts, was committed within the district
which included the county, and, for the purposes of such juris-
diction, extended 100 rods beyond its boundary line; and that
the mere fact that such district included territory over which
there was jurisdiction in common with another district did
not make it repugnant to the constitutional clause in ques-
tion. The doubt expressed by Chief Justice RYAN [in *In re
Eldred*, 46 Wis. 548] as to "whether the legislature could
appoint a district greater or less than the county for trial of
a crime complete within a county" is inconsistent with what
he said in the same opinion, and is without foundation, and
contrary to a recent decision of this court. *Shaffel v. State*,
97 Wis. 377, 380, 381. This is made plain by what is there
said by Mr. Justice WINSLOW, as follows:

"If there may be a district with different boundaries from
those of a county, why may not such district be smaller than
a county, as well as larger? We see no good reason. Cer-
tainly, it must be either larger or smaller, if the word is
to have any meaning. And we know of no facts, either in
the history of the state or of the formation of the constitu-
tion, which would justify us in holding that the word 'dis-
trict,' as here used, must mean a district larger than a
county, and nothing else. We give the word its natural
meaning, and, so doing, we hold that a judicial district may
be created smaller than a county, and that a jury summoned
from such district satisfies the constitutional guaranty."
*Pooler v. State*, 97 Wis. 630.

The State vs. McDonald.

Counsel cite three cases from Missouri which are claimed to hold a different doctrine, but none of them was based upon a constitutional provision like ours. On the contrary, they were all based upon the constitution of that state adopted in 1875, where the language was "impartial jury of the county." Sec. 22, art. II, Const. Mo. The language of the prior constitution of that state was "impartial jury of the vicinage." So the case cited from Arkansas was based upon the constitution of that state adopted in 1874, where the language was "impartial jury of the county," with a provis-ion for changing the venue. Sec. 10, art. II, Const. Ark. So the case cited from West Virginia was based upon the constitution of that state adopted in 1872, where the lan-guage was "in the county where the alleged offense was committed," unless the venue should be changed. Sec. 14, art. III, Const. W. Va. As pointed out in *State ex rel. Brown v. Stewart*, 60 Wis. 597, in the Tennessee case cited by coun-sel the words "or district" were treated as a mere super-fluity. The same is true of the Illinois case now cited by counsel.

Would this court be justified in thus eliminating the words "or district" from the provision of the constitution in question? If they were not intended to have any mean-ing, then we perceive no reason for using them in connection with the word "county." As indicated by Mr. Justice PAINE in the case cited, the provision of the constitution in question was taken from article VI of the amendments to the constitution of the United States, substituting the word "county" for "state," and the word "or" for "and," so that it reads "county *or* district" instead of "state and district," and substituting for the words "which district shall have been previously ascertained by law" the words "which county or district shall have been previously ascer-tained by law." The obvious reason why the conjunctive was used is that in some of the states there were two judi-

cial districts then created and organized, and so it was designed to give to the accused the right of trial by jury in the district as well as in the state. And yet it has been held by the supreme court of the United States that the district court of the United States for the Eastern district of Michigan had, under the statute of the United States, jurisdiction "to try a person for an assault with a dangerous weapon committed on a vessel belonging to a citizen of the United States, when such vessel is in the Detroit river, out of the jurisdiction of any particular state, and within the territorial limits of the dominion of Canada." *U. S. v. Rodgers*, 150 U. S. 249. Of course, in that case the offense was not committed in any other state or judicial district. Such change of phraseology in our state constitution was obviously made with deliberation and for the purpose of leaving the legislature untrammeled in the matter of forming judicial districts. It would in most cases be very difficult to convict persons guilty of offenses on the waters of Green Bay, or the other waters mentioned, if the state were required to allege and prove the particular county in which the offenses were committed.

We must hold that the counties on the shores of Green Bay "have jurisdiction in common of all offenses committed on that part of said Green Bay which lies within the limits of this state." Sec. 8, Stats. 1898. In other words, each of such counties, together with that portion of Green Bay, constitutes a judicial district, within the meaning of the constitution. *Id.* True, the word "jurisdiction" may have been inaptly applied to counties in that section; but, when we consider the whole section, it is obvious that the "jurisdiction in common" refers to the jurisdiction of the courts in the respective counties. Sec. 8, R. S. 1878, and sec. 8, Stats. 1898. We must hold that section to be constitutional and valid. It follows that the first question certified must be answered in the affirmative.

The State vs. McDonald.

The *second* question certified is this: "Was the defendant, at the time of the commission of the alleged offense, an agent of the superintendent of fisheries, authorized in writing, within the meaning of sec. 15, ch. 311, Laws of 1899 ? "

The *third* question certified is as follows: "Was the defendant, at the time of the commission of the alleged offense, in the presence of the superintendent of fisheries or his agent authorized in writing, within the meaning of sec. 15, ch. 311, Laws of 1899 ? " That section provides:

"The commissioners of fisheries, or other persons authorized by law to propagate fish, shall have the power and are authorized to take fish at all seasons of the year from the outlying waters of the state for stocking other waters or for the purpose of securing eggs for artificial propagation; and shall dispose of said fish in such manner as they deem to be to the best interest of the state: provided, however, that no such fish shall be taken except in the presence of the superintendent of fisheries or his agent authorized in writing."

The waters of Green Bay are declared by statute "to be outlying waters," and hence come within the provisions of the section quoted. The substance of the contracts between Kalmbach and the commissioners of fisheries and James Nevin, the superintendent of fisheries, is given in the statement of facts. Under those contracts the three tugs mentioned as being furnished by Kalmbach, the sailboats, nets, and outfits, and men to run the boats and operate the nets, were so furnished for the use of the commissioners, and with them enough fish were to be caught, under the direction of the superintendent and his agents, for securing the amount of spawn required. Such contracts of themselves would seem to be sufficient authority in writing to Kalmbach to so furnish the tugs, sailboats, nets, outfits, and men for such use of the commissioners. Under such circumstances the superintendent of fisheries, eleven days prior to the commission of the alleged offense, gave written permission and authority to Kalmbach to allow the McDonald Bros., including the defendant, "with the fish tug Fish

Hawk, to set nets to catch white fish to get spawn *on the same conditions that his tugs* [named in the contracts] are allowed to fish." This written permit, with the concurrence of McDonald Bros., placed the fish tug Fish Hawk and its outfit as effectually in the service and use of the commissioners of fisheries as either of the three tugs mentioned in their contracts with Kalmbach. Such written authority was to McDonald Bros., with their "fish tug Fish Hawk to set nets to catch white fish," etc., whenever allowed to do so by Kalmbach. In fact, such written authority was to both McDonald Bros. and Kalmbach. Since such written permit gave such authority, and was actually delivered by the superintendent of fisheries, it is not conceived to be material whether it was in the actual possession of McDonald Bros. or Kalmbach.

It appears that after the delivery of such permit to Kalmbach, and pursuant to his instructions, McDonald Bros., in pursuance of such permit, engaged in taking fish from the waters of Green Bay with the fish tug Fish Hawk for the purpose of obtaining fish spawn for such commissioners, and that as often as the boat landed at Detroit Harbor, the point from which the boat went out for fish, and to which it returned with fish, such fish and spawn were turned over to such superintendent or his agent, Frank Suthers, then in the employ of such commissioners, and the same were then weighed by Nevin or Suthers, and delivered to Kalmbach, from whom McDonald Bros. received pay for all fish so caught; that upon the day of the alleged offense the firm of McDonald Bros., composed of the defendant and his copartner, together with the crew of the Fish Hawk, were fishing with nets for white fish in the waters of Green Bay at the place described, and the crew caught both trout and white fish, but took no spawn; that on that day Nevin was at Green Bay and Suthers at Sturgeon Bay, neither being at Detroit Harbor nor on the fishing tug Fish Hawk; that at

the time of the commission of the alleged offense the "defendant was in all things complying with the conditions and requirements of the contracts" mentioned between such commissioners and Kalmbach. It follows from what has been said that the second and third questions certified must each be answered in the affirmative.

The *fifth* question certified has, in effect, been answered by what has already been said, and hence requires no specific answer. By the *fourth* and *sixth* questions certified we are asked to determine whether the trial court committed an error on the trial by refusing to allow the defendant's counsel to address the jury, and also by charging the jury that they must find the defendant guilty. It is claimed on the part of the state that such questions can only be properly determined when embodied in a bill of exceptions and brought here by writ of error. Without determining that question, we have concluded not to answer either of those questions, as neither is essential to the determination of the case.

*By the Court.*— The first, second, and third questions certified are each answered in the affirmative, and the others are left unanswered.