## EX PARTE IDA MAY. INNES.

### No. 3370.   Decided January 13, 1915.

Rehearing denied February 10, 1915.

**1.—Extradition — Fugitive from Justice — Case Stated — Involuntary Asylum.**

Where the record on appeal showed that the relator did not come into this State voluntarily, but that being charged with crime alleged to have been committed in Bexar County, State of Texas, the Governor of Texas issued a requisition on the Governor of Oregon, who honored the same, and relator was in Texas by reason of being brought here on that requisition; that relator, after being tried for the offense charged in Bexar County, was acquitted, and that it then developed that while relator was in jail in said Bexar County, the Governor of Texas had granted a requisition from the Governor of Georgia, and instead of being discharged from custody, relator was immediately arrested on said last requisition; whereupon she sued out a writ of habeas corpus, and the court below refused to release her, but turned her over to the Georgia authorities. Held: that the Governor of this State had authority to grant the requisition from the Governor of Georgia. Davidson, Judge, dissenting.

**2.—Same—Statutes Construed—Federal Constitution—Found in State.**

The language of our statute is in accord with the provisions of the Federal Constitution, is violative of no provision thereof, and especially grants to the Governor of Texas the authority to issue the requisition whenever a person charged with crime in another State is found within the borders of the State of Texas, and the Governor of Texas, having acted in conformity with and under the authority of the statutes of this State, which are in accord with the Federal Constitution, there was no error in honoring the requisition from the Governor of Georgia, and relator was a fugitive from justice from said demanding State. Davidson, Judge, dissenting.

**3.—Same—Federal Constitution—Federal Statutes—Words and Phrases.**

The Federal Constitution provides that a person charged in any State with treason, felony, or other crimes, who shall flee from justice, and be *found* in

another State, shall on demand of the executive authority of the State from which he fled, be delivered up to be removed to the State having jurisdiction of the cause, and the courts can not look alone to the Federal statute enacted under the Federal Constitution, which contains the qualifying words, "to which he has fled," and the power to honor a requisition is not limited to the Governor of the State to which such person may voluntarily go. Following Ham v. State, 4 Texas Crim. App., 645. Davidson, Judge, dissenting.

Appeal from the District Court of Bexar. Tried below before the Hon. W. S. Anderson.

Appeal from a habeas corpus proceeding, asking release from a requisition of extradition from the Governor of Georgia to the Governor of Texas, which was denied.

*R. H. Ward,* for relator.—See authorities in companion case.

*C. C. McDonald,* Assistant Attorney General, for the State.—See authorities in companion case.

HARPER, JUDGE.—This is a companion case to that of Victor E. Innes, this day decided, and the facts are identical. There can be no question that relator is a fugitive from justice. She is charged with crime alleged to have been committed in the State of Georgia, and she fled from that State, but it is insisted that she fled to the State of Oregon and had her residence in that State, and the Governor of that State might honor a requisition, yet the Governor of Texas could not do so because her presence in this State is not voluntary—that she had not fled to this State for an asylum. The only question we think it necessary to discuss is, did the Governor of Texas have authority in law to grant the requisition and order her to be delivered to the Georgia authorities? The record discloses that she did not come into this State voluntarily, but that being charged with crime, alleged to have been committed in Bexar County, the Governor of Texas issued a requisition on the Governor of Oregon, who honored same, and she was in Texas by reason of being brought here on that requisition. When tried for the offense with which she was charged in Bexar County, she was acquitted. It then developed that while she was in jail in Bexar County the Governor of Texas had granted a requisition from the Governor of Georgia, and instead of being discharged from custody she was immediately arrested on the requisition. A writ of habeas corpus was sued out before Judge Anderson, who refused to release her, and ordered her turned over to the Georgia authorities to be conveyed to that State to be tried for the offense with which she is charged in that State. From that order relator has appealed to this court, and makes the contention that as she was brought here from Oregon by the officers, the Governor of this State has no authority to grant a requisition.

This is a question that has been before the courts of this country but a few times, and the decisions are not entirely in harmony. Mr. Spear, in his work on Extradition, sustains the contention of relator, and bases his reasoning mainly on the wording of the United States statute,

which reads as follows:   Sec. 5278, U. S. Rev. Stat.   "Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State or Territory to which such person has fled, and produces a copy of an indictment found, or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the Governor or Chief Magistrate of the State or Territory from whence the person so charged has fled, it shall be the duty of the executive authority of the State or Territory to which such person has fled to cause him to be arrested and secured," etc.

It will be noticed that this statute requires the requisition to be issued by the Governor of the State from which the person *has fled,* and it has been held, as contended by Mr. Spear, in almost an unbroken line of decisions, that unless a person was in the State at the time of the commission of the offense and subsequently left that State, such person can not be extradited under the above statute and the provisions of the Federal Constitution.   However, this rule of law need not be herein discussed, for it is unquestioned that relator was in the State of Georgia at the date of the alleged offense, and subsequently left that State and went to Oregon, from which State she was brought to Texas by extradition process.

It is contended that as this construction has been given to those words in the statute and the Constitution, that the same construction ought to be given to the words "to the State to which she has fled," and unless one has voluntarily gone into a State, the Governor has no authority to grant a requisition.   The Federal Constitution contains no such qualification, and provides instead:   "A person charged in any State with treason, felony or other crime, who shall flee from justice *and be found* in another State, shall, on demand of the executive authority of the State *from which he fled,* be delivered up to be removed to the State having jurisdiction of the cause."

Relator admits that the constitutional provision has no clause which limits the right to honor the requisition to the chief executive of the State to which the prisoner has fled, but instead uses the words, in which he may *be found,* yet the insistence is made that this clause of the Constitution is not self-executing, and, therefore, we must look alone to the statute enacted thereunder, and as this statute contains the qualifying words "to which he has fled," the power to honor a requisition is limited to the chief executive of a State to which such person may voluntarily go.

In support of his text Mr. Spear cites but one authority, that of Daniel's case, which came before Judge Parsons, of the Quarter Sessions Court in Philadelphia, in 1848, the court holding, Judge Binns rendering the decision, "Where a defendant is brought into a State as a fugitive from justice he can not be surrendered to the authorities of another State as a fugitive, but must be allowed an opportunity to return to the

State in which he is domiciled." While this is the only authority cited by Mr. Spear, yet it may be said in support of that doctrine, the Governor of New York, in 1889, refused to grant a requisition under such circumstances. James Hope was charged with crime in New York, and the Governor of California honored the requisition of the Governor of New York. Hope was tried and convicted. After having served the term of punishment assessed, the Governor of Delaware issued a requisition and asked the Governor of New York to surrender Hope to that State to be tried for a crime for which he stood charged in that State. The Governor of New York refused to grant the requisition, basing his ruling on that line of cases in which it was held that where a person has been extradited from one State to another on a particular charge, that he could only be tried for that offense and no other offense. This rule has never been adhered to in this State, but on the other hand the reverse has been specifically held in this State. In the case of Ham v. State, 4 Texas Crim. App., 645, this court held:

"Suppose, then, as in the case at bar, he is surrendered and extradited, can he be tried for any other offense than the one for which he was extradited? Where is the prohibition? Good faith and comity leave that entirely to the discretion of the State which had the right to demand him for any crime which he committed, and which, having once rightfully obtained jurisdiction of his person, is only limited in her treatment of him to the responsibility of seeing that the same privileges and immunities which her laws would afford to one of her own citizens are extended and guaranteed to him.

"Since the able briefs, both of the learned counsel for the appellant and Attorney General Boone, for the State, were prepared in this case, this identical question here discussed was submitted 'in the matter of Noyes,' upon habeas corpus, before the United States District Court for the District of New Jersey, May 27, 1878, and it was held that 'a fugitive from justice, extradited, under the Act of Congress, from one State in the Union, on the charge of the commission of a specific crime, can be held by the courts of the State to which he is surrendered for trial for another and different crime.' Nixon, J., delivering the opinion in that case, most pertinently and pointedly remarks: 'But here a court of competent jurisdiction has the custody of a person who is charged with the commission of certain offenses against the laws of the State. The answer to the charge is, that some other person has done a wrong to the prisoner by violating the laws of another State in arresting him without proper authority. In a criminal case this can hardly be reckoned a pertinent response. It is a claim on the part of the accused that his criminal violations of the law are to be condoned by his personal injuries. It is asking the court to suspend its responsible duties, towit, the trial of offenders against the Penal Code of the State, while the persons charged with the crime are instituting preliminary investigations into the methods adopted to bring them within its jurisdiction. Such a course, for obvious reasons, is allowable in a civil suit between private litigants; but, for like obvious reasons, can not be, and never

has been, allowed in criminal proceedings, where the object of the prosecution is to punish the offender against the public."

This rule has been adhered to in Baker v. State, 43 Texas Crim. Rep., 281; Brookin v. State, 26 Texas Crim. App., 121, and has the sanction of the Supreme Court of the United States. Lascelles v. Georgia, 148 U. S., 537.

In 19 Cyc., 97, it is said: "Although there has long been a conflict in the decisions of courts of the several States, it is now generally accepted that a fugitive from justice, surrendered by one State upon the demand of another, is not protected from prosecution for offenses other than that for which he was surrendered, but may be tried for any crime committed in the demanding State either before or after extradition," citing Carr v. State, 104 Ala., 4; Lascelles v. State, 90 Ga., 347; State v. Kealy, 89 Iowa, 94; Commonwealth v. Wright, 158 Mass., 149; State v. Walker, 110 Mo., 467; Petry v. Leichger, 47 Neb., 126; People v. Cross, 135 N. Y., 536; State v. Stewart, 60 Wis., 587; State v. Glover, 112 N. C., 896.

So it is seen that the rule relied on by the Governor of New York in the Hope case is not only contrary to the rule in Texas, but is opposed to the great weight of authority, and is even no longer the rule in New York. People v. Cross, supra, and is entitled to but little, if any, weight, in passing on the question involved in this case.

The Daniel's case relied on by Mr. Spear to sustain his text was not rendered by a court of final resort, but only a court of Quarter Sessions, and is entitled to only such weight as its reasoning may justify. In opposition to the doctrine therein announced, we find the question of surrender to a third State was before the courts in Illinois in 1879, in the case of People ex rel. Suydam v. Sennott:

"The facts in the case of Sennott are that, having committed a crime in Pennsylvania, he went first to West Virginia, where he remained a while, and then to Chicago, in the State of Illinois, where he resided for about two years. He then left Chicago and went to New York, from which State he was brought back to Illinois on a charge of crime there committed. After his return he was discharged on habeas corpus; but he was immediately rearrested on a warrant issued upon a requisition of the Governor of Pennsylvania demanding his rendition for the crime committed in that State. An application was at once made to Judge McAllister, of the Circuit Court of Cook County, Illinois, for the discharge of the prisoner on habeas corpus. The ground chiefly relied upon was that he had not fled to Illinois, but was brought there against his will. It was contended that under the Act of 1793 he must have fled to Illinois. The court said that the Constitution of the United States provided for the surrender of persons 'who shall flee from justice and be found in another State.' The Act of Congress says: 'Whenever the executive authority of any State or Territory demands any person as a fugitive from justice of the executive authority of any State or Territory to which such person has fled.' The court said a point

was made of the difference in language, but if the Constitution and the Act differed the former must prevail.

"'It seems to me,' said Judge McAllister, 'to be a fair interpretation of the constitutional provisions, that the other requisites being supplied, it is only necessary, to justify the arrest under the executive warrant, that the person should be a fugitive from the justice of the demanding State, and be found in the State where the warrant issued. I, therefore, do not concur in the position that the relator can not be amenable to such warrant, unless he had fled to this State, and remained here as such fugitive at the time of his arrest. Having committed the crime in Pennsylvania, and then departed the State, he is to be regarded as a "fugitive from justice," so long as he keeps out of the State, and subject to the extradition laws, unless that State has lost its right to demand him by her own laches. The executive warrant in these cases is a criminal process, and when he was discharged from imprisonment under the proceedings by which he was brought here, by what rule of law, if he was here as a fugitive from justice, he could be exempt from such process, I confess myself unable to understand. The Governor was under no duty to return him to New York, or guarantee a safe return. He might be privileged from arrest on civil process by a well settled rule of law, but not from a criminal one. No such privilege is known to the law. The only requisites of a case, under the Constitution and laws are: (1) The person demanded must be charged in some State with treason, felony, or other crime. (2) He must be a fugitive from justice, because he is expressly described as one who shall flee from justice, and who is to be delivered upon demand of the executive authority of the State from which he fled. (3) He must be found in another State than the one in which the crime is charged to have been committed.'

"The court accordingly dismissed the writ, and remanded the prisoner into custody. He then obtained another writ of habeas corpus from Judge Drummond, of the United States Circuit Court for the Northern District of Illinois. Judge Drummond took the same view of the matter as Judge McAllister, and Sennott was taken back to Pennsylvania.

"The same question was considered by the Supreme Court of Indiana in 1886, in the following case: A person committed a crime in Michigan and fled to Indiana, where he was arrested and held in custody from December 12, 1884, till September 12, 1885, on an indictment for a crime committed in the latter State. On December 29, 1884, the Governor of Indiana, upon the requisition of the Governor of Michigan, issued a warrant for the prisoner's arrest and rendition. This warrant was not then executed owing to the fugitive's being held for trial in Indiana for a crime there committed. On September 12, 1885, he escaped from jail and fled to Ohio, from which State he was brought back to Indiana by regular rendition proceedings. He was then held in custody until April, 1886, when a *nolle prosequi* was entered. He was then arrested on the warrant of rendition, and claimed that, having

been brought into Indiana from Ohio by 'extradition' proceedings, he could not be delivered up to the State of Michigan without an opportunity to return to Ohio. The court held otherwise." In commenting on this case Mr. Moore, in his work on Extradition, says: "In so doing it laid much stress on the fact that the fugitive originally came voluntarily into Indiana, and should not by reason of his flight from the State be placed in a better position than if he had not fled. This, the court said, distinguished it from most of the other cases. The force of this reasoning may be doubted. If it be held that a fugitive can not be permitted to derive any advantage from his flight, the rule that he can not be tried for an offense other than that for which he was surrendered must be rejected. This rule applies only to offenses committed previously to extradition, and, practically, previously to flight. It is not doubted that a fugitive may be tried for an offense committed subsequently to his extradition. The fact that he is within the jurisdiction as an extradited person does not'exempt him from obedience to the laws. But the distinction noted by the court may be thought to be open to another objection. It assumes that in order to be a fugitive from justice, the criminal must have come voluntarily into the State from which his surrender is demanded, or have sought asylum there. For, it is to be remembered that when he was brought into Indiana on rendition process it was from Ohio, and he could not, therefore, allege on that ground that he did not flee from Michigan. As a rule, proof of seeking asylum is not necessary under treaties; and it certainly is not so in rendition under the Constitution, which only requires that he shall be 'found.' He may be inveigled or deceived into coming into the jurisdiction, or may be there as the result of casualty. It has been held that even the employment of legal processes or of illegal violence invests him with no personal privilege which he can set up as against the demands of justice, unless, where legal processes are employed, the law confers upon him such immunity. Such immunity the court did not hold to exist in interstate rendition. On the contrary, it referred with disapproval to the case cited from Binns, Justice, to the effect that a person delivered up by one State to another can not be given up to a third State without having had an opportunity to return to that which surrendered him. The court observed that that case was decided by the Court of Quarter Sessions of Philadelphia, and was, therefore, of little authority, and cited against it the opinion of Chief Justice Gibson in Dows' case. The decision of the Supreme Court of Indiana may, therefore, be held to have involved the rejection of the theory that, where one of the United States obtains possession of a criminal by rendition proceedings, it holds him for the sole purpose of trying him on the charge upon which he was given up."

After commenting on the above cases, Mr. Moore on Extradition, section 646, says: "Considering the case solely from the point of view of the prisoner, of what right can it be said that he is deprived by his delivery up to a third State? It is not his right to have the question of his surrender determined by the Governor of any particular

State. That question is, under the Constitution, to be determined in any State in which he may be 'found.' This does not mean that, having once been found in a certain State, he is entitled thereafter to have the question of his rendition for all prior offenses determined by the Governor of that State, until he shall have left its jurisdiction voluntarily. Yet this is precisely what is signified by the right of return to the jurisdiction of the surrendering State, as held to exist in extradition cases; the reason being that the fugitive, when recovered, was under the protection of the surrendering nation. This principle possesses no relevancy to the States of the United States."

Relator also relies on the case of Hyatt v. New York, 188 U. S., 691. In that case the question presented in this case was not involved, but the sole question presented and decided was, that Hyatt not having been in Tennessee at the time of the alleged commission of the offense charged, he was not a fugitive of justice from Tennessee—that not having been in the State he had not fled from it, and the question of whether one who has fled from a State after the alleged commission of an offense and been extradited from one State to another, can then be extradited to a third State was not discussed or mentioned, consequently that case can not be held to decide any question here involved.

So far as the authorities go, we have the Daniel's case, decided by the Quarter Sessions Court of Philadelphia, and Mr. Spear on Extradition, holding that one can not be extradited to a third State on the one hand, and we have the cases of Suydam v. Sennott, decided by the Illinois courts, and then by Judge Drummond of the United States Circuit Court; the case of Hackney v. Welsh, decided by the Supreme Court of Indiana (107 Ind., 253), and Mr. Moore on Extradition, holding that a person who has been brought into a State by force can be extradited to a third State.

Church, in his work on Habeas Corpus, section 472, holds: "A fugitive brought by requisition from another State may be surrendered to a third State." Cyc., volume 19, page 99, says the rule is that "as a State to which a person has been illegally brought may hold him to answer for his offenses against it, it may arrest and surrender him on extradition proceedings to answer for his offenses against another State." And in Brown's case, 28 Fed. Rep., 653, in which case Brown had committed an offense in Pennsylvania and fled to Canada, he was induced by duplicity and fraud to go into New York temporarily, and was arrested. It was held that the Governor could and should honor the requisition of the Governor of Pennsylvania. So it may be said that the weight of authority sustains the action of Governor Colquitt in granting the requisition in this case, and his act was not illegal. Again, 19 Cyc., 85, says: "As the Constitution, however, applies only to fugitives from justice, a State may in the exercise of its reserved sovereign power provide for the surrender of persons indictable for crime in another State, but who have never fled from it." And this rule is supported by State v. Hall, 115 N. C., 811, and In re Mohr, 73 Ala., 503, and other cases, and we see no reason why such is not a sound

proposition of law. Before the forming of the Union each State was a separate and independent sovereignty, and in forming the Union they parted with only such sovereign power as was ceded to the general government—all other powers of sovereignty inherent in them was reserved to each State, and we can see no good reason why a State can not provide for the surrender of persons charged with crime in a sister State not provided for in the cession to the Federal government or in furtherance of the ceded power. Our State has provided in article 1088, C. C. P.: "A person charged in another State or Territory of the United States with treason, felony or other crime, who shall flee from justice and *be found in this State,* shall, on demand of the executive authority of the State or Territory from which he fled, be delivered up to be removed to the State or Territory having jurisdiction of the crime."

.When relator was indicted in Georgia, and the authorities of that State ascertaining that she had fled from that State, began to look for her they found her in Texas. To what State could or should they apply for her extradition but the State of Texas? No other State had jurisdiction of her person at that time, and no other could at that time grant extradition process. The rule stated by Mr. Spear that "as she was brought here on extradition, if she chooses to stay here and does stay here, Georgia would have no means of getting possession of her person and bringing her to justice for an offense committed in that State," we do not believe to be the law, for it would nullify and render ineffective the plain intent and purpose of the States in ceding authority to the Federal government the right to provide for extradition of persons charged with crime from one State to another State. It was not intended to create an asylum under circumstances from which a person charged with crime could not be extradited, but the reverse is true, that no asylum should be provided by any State or Territory.

The language of our statute is in accord with the provisions of the Federal Constitution, is violative of no provision thereof, and specifically grants to the Governor of this State the authority to issue the requisition whenever a person charged with crime in another State is *found* within the borders of this State, and our Governor having acted in conformity with and under the authority of the statutes of this State, which are in accord with the Federal Constitution, we are of the opinion he committed no error in honoring the requisition, and the relator is remanded.

The judgment is affirmed.

*Relator remanded.*

[Pending on writ of error in U. S. Supreme Court.—Reporter.]

DAVIDSON, JUDGE (dissenting).—I have been unable to agree with my brethren in the disposition of this case. They have discussed questions that are not, in my judgment, germane, I shall pass those without discussion

The relator was extradited from the State of Oregon to Texas at the

request of the Governor of Texas to answer a charge of murder. She was brought to San Antonio, tried and acquitted of murder. The grand jury also indicted her for conspiracy. Upon acquittal for the homicide, the conspiracy case was dismissed. She was not, however, granted her freedom, but held' by order of the court to await extradition demands from the State of Georgia. Resort to writ of habeas corpus was had to obtain release. This was refused. This is a sufficient statement of the facts to discuss the questions in hand.

The only contention I purpose to discuss is based upon the fact that relator is not a fugitive from justice in Texas from the State of Georgia, because she was brought from the State of Oregon to Texas under the extradition process, that is, by the strong arm of the law, and her presence in Texas was not of her own volition or voluntary act. The Federal Constitution provides: "A person charged in any State with treason, felony, or other crime who shall flee from justice and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up to be removed to the State having jurisdiction of the crime." This clause of the Constitution not being self-executing, see Hyatt v. Cochran, 188 U. S., 691, 47 L. Ed., at page 708; Kentucky v. Dennison, 24 Howard, 66, at page 104, 16 L. Ed., 717-728; Roberts v. Reilly, 116 U. S., 80. Congress passed the following statute, section 5278: "Whenever the executive authority of any State or Territory demands any person as a fugitive from justice, of the executive authority of any State or Territory to which such person has fled, and produces a copy of an indictment found, or an affidavit made before a magistrate of any State or Territory, charging the person demanded with having committed treason, felony or other crime, certified as authentic by the Governor or chief magistrate of the State or Territory from *whence the person so charged has fled*, it shall be the duty of the executive authority of the State or Territory *to which such person has fled* to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest, the prisoner may be discharged. All costs or expenses incurred in the apprehending, securing, and transmitting such fugitive to the State or Territory making such demand shall be paid by such State or Territory."

This case, of course, arose under this section of the Acts of Congress. There are many decisions in the United States, both Federal and State, construing the congressional Act from various standpoints. There are few cases, however, in point on the particular question here raised, and so far as I have been enabled to discover the case of Suydam v. Sennott, 20 Albany Law Journal, 230, is the main case which holds that relator would be subject to extradition under the facts of this case. Hackney v. Welsh, 107 Ind., 253, is cited in support of the Suydam case, but in my judgment it does not support it. In the Suydam case, as in this

case, the parties were by compulsory process brought into the asylum State. The party was not there of his own volition or act. In Hackney v. Welsh, supra, the extradited party or the party sought to be extradited, was in Indiana of his voluntary act, and that is emphasized in the opinion of Judge Elliott. In that case the party came from Michigan to Indiana of his own volition and was there arrested, and was in Indiana at the time of the demand of the Michigan executive for his extradition. After the extradition papers reached Indiana the party escaped from jail and went to Ohio, and was subsequently extradited from Ohio to Indiana. The court held, as he came into Indiana of his voluntary act and had escaped after papers had reached Indiana from Michigan, he was subject to extradition. So it will be plainly seen that case has but little if any application here. The authorities, generally speaking, are opposed to Suydam case, supra, and hold that the act of the alleged fugitive coming into the asylum State must be voluntary and not by compulsion. This, as I understand, was the holding in the Indiana case, supra. Mr. Spear, in his work on Extradition, pages 558 to 571, reviews the cases then in existence, and criticises sharply the opinion in the Suydam case as being incorrect, and reaches the conclusion that in order to authorize the extradition of the party he must have come into the asylum State of his own volition. In other words, he must *have fled* into the asylum State. It might be entertaining to follow the reasoning of the decisions and of Mr. Spear, but those who desire to do so can read these authorities. I do not care to write at length in regard to the course of such reasoning. The view expressed and entertained by Mr. Spear is also to be found in Hyatt's case, supra, in an opinion by Mr. Justice Peckham of the Supreme Court of the United States, who uses this language: "It speaks of a demand by the executive authority of a State for the surrender of a person as a fugitive from justice, by the executive authority of a State *to which such person has fled,* and it provides that a copy of the indictment found, or affidavit made before a magistrate of any State, charging the person demanded with having committed treason, etc., certified as authentic by the Governor or chief magistrate of the State or Territory *from whence the person so charged has fled,* shall be produced, and it makes it the duty of the executive authority of the State *to which such person has fled* to cause him to be arrested and secured. Thus the person who is sought must be one who has fled from the demanding State, and he must have fled (not necessarily directly) to the State where he is found. It is difficult to see how a person can be said to have fled from the State in which he is charged to have committed some act amounting to a crime against that State, when in fact he was not within the State at the time the act is said to have been committed. How can a person flee from a place that he was not in? He could avoid a place that he had not been in; he could omit to go to it; but how can it be said with accuracy that he has fled from a place in which he had not been present?"

If relator could not have fled from the State of the alleged crime because of his want of presence in that State, how can it be said *that*

he fled into the asylum State when he was carried there by the strong
arm of the law without any volition on his part or against his will?
The Act of Congress proceeds upon the theory that the act of the party
in fleeing from the demanding State and fleeing into the asylum State
is voluntary. It excludes the idea of compulsion or duress. If flight
is a voluntary act, then it could not be imputed to him as a voluntary
act that he had been carried by the overpowering command of official
authority into a State as his voluntary act. It occurs to the writer
that the conclusion is irresistible, that Mr. Justice Peckham's inquiry
must be answered to the effect that, before a party is a fugitive in the
asylum State, or has fled to the asylum State, that he must himself do
so voluntarily and not be carried by official authority. This is com-
pulsion and in the nature of duress. It robs a party of all volition;
in fact, it is not his act. If it requires *flight from the demanding State,*
then by the clear reading of the Act of Congress it *requires flight into
the asylum State.* The language is the same, is used in the same sense
in both instances in the Act of Congress, and to the mind of the writer
there seems to be no escape from the conclusion that if it must be the
voluntary act of the alleged fugitive in leaving the demanding State,
it must also be his voluntary act in being in the asylum State. This
is clearly the reasoning in the Indiana case, supra. It is too well under-
stood for discussion, that words and terms are to be taken in their ordi-
nary and accepted sense, understanding and meaning. To avoid this
the legislative authority must give the terms and words a different
meaning from such common acceptation. This is a statutory rule in
Texas, and seems to be the rule everywhere in civilized countries. Con-
gress did not see proper to change the meaning of the words "flight,"
"fled," or "fugitive," and give those words a different meaning from
their ordinary acceptation. The legislative authority may give par-
ticular meaning to words, and the courts would usually have no authority
to give meaning different from that embodied in the legislative Act.
If the Act defines them different from the common acceptation, that
definition will be accepted by the courts, otherwise we go to the ordi-
nary meaning of the words, terms or language. The clause of the Fed-
eral Constitution quoted is not self-executing, therefore it took the Act
of Congress to put it into operation. That body was clothed with
supreme authority in the matter, and in its wisdom saw proper to enact
the statute quoted and prescribe the conditions upon which the extradi-
tion may occur between the States. The courts, both State and Federal,
are bound by the Act of Congress, and should follow the intent with
which it was enacted. The statute is of such character as requires it
to be strictly construed. Ex parte Morgan, 20 Fed. Rep., 298; Roberts
v. Reilly, 116 U. S., 80. This Act of Congress does not militate against
the sovereignty of the States, and could not be held to do so. The
comity between States is to be found in the Federal Constitution, and
properly enacted legislation under such delegated authority. The
States of the Federal Union are sovereign, and as an act of sovereignty
created the Federal Constitution and delegated the authority therein

specified. This does not change or alter the sovereignty but emphasizes it in the State. The States clothed the Federal government with authority to do this particular thing, as well as many other things. This was a solemn compact entered into by the States of the Federal Union for the ulterior purpose of carrying out the will of the high contracting parties. It was intended to bring about harmonious rule of action, and Congress, enacting this legislation, did so under the authority of the States of the Federal Union. To that extent we may say that Congress is the supreme authority, and in the sense indicated this can be said to be true, and every State in the Union stands pledged to abide the solemn compact in good faith. These provisions of the Constitution not being self-executing, it devolved upon Congress to put that clause into operation and effect, and the methods and plans devised by such legislation is and ought to be binding until Congress sees proper to change it or otherwise provide. It has said, first, that a party to become a fugitive *must have fled from the demanding State;* second, to justify the authority of the demanding State to extradite, the alleged fugitive *must have fled into the asylum State.* The facts in this case exclude flight into Texas by relator, and proves beyond question that she was brought here under extradition demand. Having been freed from the accusation against her in Texas, she did not, therefore, become a fugitive from justice in Texas from the State of Oregon, or from the State of Georgia. Her presence in Texas was not voluntary, but compulsory. I do not care to discuss a state of case which would have arisen had she been discharged from custody and chosen to remain in Texas as her asylum or home. This she did not and was denied the privilege or right so to do. She was under arrest and compulsion from the time she was taken in custody in Oregon on extradition demand from Texas until her arrest on the demand of Georgia, and that custody is still existent. My brethren have injected into this case a discussion, to some extent, of the right of Texas to exercise authority over the relator for offenses for which she was not extradited. That question is not in this case. Nothing of the sort was raised nor is it here raised. Texas had disposed of the relator as to all demands either by an acquittal of murder or dismissal of the case of conspiracy, therefore there was nothing remaining in Texas to which she might be subject to prosecution. The only question here presented and discussed is, whether she had fled into Texas as an asylum after having fled from the State of Georgia. It might be entertaining to review the cases and discuss the matter more at length, but I do not deem it worth while. The language of the Act of Congress is plain, and, as I understand it, needs but little comment. She was in Oregon. This language would seem all sufficiently plain and ought to control. There are authorities which might be cited, but the reasoning of Mr. Spear has not been answered, and, in my judgment, will not be correctly answered; and until the Supreme Court of the United States has authoritatively held the other way, I shall believe the Act of Congress means, when it speaks of fleeing from the demanding State and *fleeing into* the asylum State, the voluntary act of the

alleged fugitive, and it does not mean that by being *compelled* by force of authority to come into the State would constitute *fleeing* into the State. Whether this Act of Congress should be the proper rule or not I am not concerned. As Congress has acted, such act is binding. So believing I can not agree with my brethren and, therefore, most respectfully enter my dissent, believing that the relator ought to be discharged from custody.

[This case did not reach the hands of the Reporter until July, 1915.—Reporter.]